NATIONAL LABOR RELATIONS BOARD
v. OHIO CALCIUM CO.
No. 9217.

Circuit Court of Appeals, Sixth Circuit.
Feb. 19, 1943.

Fannie M. Boyls, of Washington, D. C. (Robert B. Watts, Ernest A. Gross, Howard Lichtenstein, Ruth Weyand, and Fannie M. Boyls, all of Washington, D. C., on the brief), for petitioner.

Robert T. Caldwell, of Ashland, Ky. (Robert T. Caldwell and Porter M. Gray, both of Ashland, Ky., and A. J. Layne, of Ironton, Ohio, on the brief), for respondent.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

This case is before the court on petition of the National Labor Relations Board for enforcement of its order against respondent. The alleged unfair labor practices occurred in the State of Ohio.

The Board found that respondent had restrained and coerced its employees in the exercise of the right of self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed under Section 7 of the Act, 29 U.S.C.A. § 157, and had violated Section 8(1) of the Act, 29 U.S.C.A. § 158(1), by shutting down its plant and discriminatorily suspending five of its employees. It also found that respondent had violated Section 8(1) of the Act by refusing to bargain collectively with the United Brick & Clay Workers of America, Local 669, an affiliate of the American Federation of Labor, as the exclusive representative of its employees within the appropriate unit, and also that it had violated Section 8(3) (1) of the Act by refusing reinstatement to forty of its employees after a strike.

The Board ordered respondent—

(1) To cease and desist from engaging in the unfair labor practices found;

(2) Upon request to bargain collectively with the Union;

(3) To reinstate to their former or equivalent positions or places or upon a preferential list, thirty-nine of its striking employees. (One of the forty was omitted because he did not desire reinstatement.) In this connection the Board directed the respondent to dismiss, if necessary, new employees hired on and after June 2, 1938, in order to furnish employment to the striking employees;

(4) To make whole all striking employees to whom respondent had denied reinstatement and also five other employees whom respondent had suspended for a period of one day;

(5) Post notices.

Respondent resists enforcement of the Board's order on the following grounds:

(1) That the present decision and order of the Board is void because it was approved by the Chairman of the Board only and was not concurred in by a majority of the Board;

(2) That the findings of the Board are not sustained by substantial evidence;

(3) That the cease and desist order of the Board is not sustained or warranted by the findings of the Board or the evidence before it.

The order which is sought to be enforced is signed by Harry A. Mills, Chairman. Edwin S. Smith, another member, concurred in part and dissented in part to the decision and order. Member Smith concurred in the order insofar as it sustained the allegations of the complaint and dissented insofar as the decision and order failed to find that respondent had engaged in unfair labor practices immediately preceding and during the first strike commencing February 20, 1938, and also so much of the decision and the order as failed to find that respondent had committed an unfair labor practice by discharging eight of its employees.

Member William M. Leiserson, concurred in part and dissented in part to the decision and order. He approved so much of the decision and order as found that respondent interfered with, restrained and coerced its employees in the exercise of their rights guaranteed under Section 7, within the meaning of Section 8(1) of the Act and dissented from the remainder of the order.

It will thus be seen that two members of the Board concurred in the order in its entirety. Member Smith was of the opinion under the evidence that the respondent had committed other unfair labor practices denounced by the Act and Member Leiserson concurred in only one finding.

Section 3(a) of the Act, 29 U.S.C.A. Sec. 153(a), provides that the National Labor Relations Board shall be composed

724

of three members and Section 3(b) of the Act, 29 U.S.C.A. Sec. 153(b), provides that two members of the Board shall at all times constitute a quorum. There is no provision of the Act requiring a unanimous vote of the Board.

▮ Authority vested in a Board for public purposes may be executed by a majority of the members if all have had notice and an opportunity to act. Plymouth Coal Co. v. Commonwealth of Pennsylvania, 232 U.S. 531, 547, 34 S.Ct. 359, 58 L.Ed. 713. A majority of the members of the Board concurred in the present decision and order. It is therefore the act of the full Board and must be viewed as though all three members approved it. Baltimore & O. R. Co. v. United States, 298 U.S. 349, 362, 56 S.Ct. 797, 80 L.Ed. 1209; National Labor Relations Board v. Leviton Mfg. Co., 2 Cir., 111 F.2d 619.

Respondent is engaged in the mining of stone and reducing it to lime in kilns. Its product is sold under the trade name of "Calsifer," which is used largely in steel mills. The usual complement of men employed by respondent is about fifty. In midyear 1937, respondent's business became a victim of the current recession and by January 1938, it was faced with the problem of reducing wages and personnel. The carrying out of these retrenchments resulted in respondent's employees becoming dissatisfied and some of them made an attempt to organize collectively for the purpose of improving their working conditions and pay status. The whole matter finally culminated in a majority of respondent's employees, excluding supervisory and clerical workers, selecting the United Brick & Clay Workers Local 669, an affiliate of the American Federation of Labor as a bargaining agent.

In the course of negotiations between respondent and its employees' representative, controversies developed and resulted in a strike at respondent's mine and mill which lasted from February 20, 1938, to April 27, 1938. Much of the evidence in the record and the argument of counsel in their briefs, relate to events occurring immediately prior to April 27, 1938, but as we view the issue here, these matters are largely immaterial.

On April 27, 1938, respondent and its employees' representative, under the supervision of the Board's agent, entered into a settlement of all prior controversies and in the present decision and order a majority of the Board gave effect to that settlement and refused to consider evidence of any unfair labor practice immediately prior to that date.

The Board found, however, that after this settlement some employees were guilty of careless or willful abuse of respondent's property, which caused a partial stoppage of work for which respondent did not institute any punitive measures, but on the other hand that it made an effort to maintain amicable relations with its employees and the Union and on various occasions conferred with union grievance committeemen or with Charles S. Stinson, union representative, regarding complaints and adjustment thereof. Page 92, Board's decision and order.

▮ Under the provisions of the Act the findings of the Board as to the facts will be re-examined to determine if they afford any legal basis for the order sought to be enforced and the ultimate facts relied upon by the Board may also be re-examined in the light of the evidence to determine if they are supported by the record.

In the following statement of facts we have conformed in the main to the findings of the Board, but we have added certain undisputed facts found in the record.

The Trial Examiner recommended that the complaint be dismissed as to all allegations of discrimination because of union membership as to allegations of failure to abide by the strike settlement agreement of April 27, 1938, as to allegations of refusal to bargain on May 22, 1938, or at any other time. He also recommended that the complaint be dismissed as to discharges of May 22, 1938, and refusals to reinstate on June 1, 1938, or thereafter.

▮ One Board member supported the Trial Examiner and disagreed with his two associates. Under these circumstances a doubt may arise as to some of the basic findings of fact of the majority. Baltimore & O. R. Co. v. United States, supra (op., 298 U.S. 362, 56 S.Ct. 797, 80 L.Ed. 1209.)

In considering the issue of substantial evidence it is not inappropriate to give due weight to what had transpired between respondent and its employees immediately before the strike of May 24, 1938. When the earlier strike was terminated April 27, 1938, respondent entered into a collective bargaining agreement with the Union which had the approval of the Regional Office

of the National Labor Relations Board. In May 1938, a controversy arose between respondent and some of its employees, which revolved around a demand that two employees be hired in the mines in addition to those usually doing the work of loading cars. The management met with the Union committee and sought to settle this difference but without success, and was informed by Shope, a member of the grievance committee, that the men would not work the next day, May 21, 1938, unless their demands were met. On May 21, 1938, respondent's president called Charles S. Stinson, an organizer for the A. F. of L. at Ashland, Kentucky, and asked him to come to the plant and assist in settling the dispute between respondent and its employees. On May 22nd, eight employees refused to work unless their demands were met and the management dismissed them. Stinson came on that date and met with respondent's officers and requested respondent to reinstate the discharged employees and threatened to call a strike if compliance was not had. On May 23, 1938, respondent's president telephoned Phillip G. Phillips, Regional Director of the Labor Board at Cincinnati, Ohio, requesting him to come to the plant and see if he could settle the controversy. Phillips sent his assistant, Wallace Miller, who insisted on respondent acceding to the demands of the employees that it employ two additional men for the loading of each car.

On May 23, 1938, respondent's employees who were members of the Union met and voted to strike, and the Union prepared a notice of the employees' intention and sometime during the day delivered a copy of it to the son of the president of respondent. The next day, shortly before four o'clock, the committee for the Union delivered the notice in writing to respondent's president. It was worded as follows:

"The Ohio Calcium Company must agree to and act on the following articles by 12:00 o'clock, noon, Tuesday, May 24:

"1. All men that were fired must be reinstated with two additional men at the lime mine.

"2. All Union men must be put to work at the lime mine or the kilns before any new men are kept.

"If the above named articles are not acted on by 12:00 o'clock, noon, you have until 4:00 o'clock P.M., Tuesday, May 24, to get all perishable products off the floor, as there will be a strike."

At four o'clock on this same day, the United Brick & Clay Workers Union called the strike at respondent's plant in protest against respondent's refusal to reinstate the eight miners whom it had discharged. The strike continued to June 1, 1938, and was participated in by forty of respondent's forty-nine employees. Six of the strikers did not belong to the Union.

After respondent had received notice of the strike Clay Joseph, who had a contract with respondent to furnish it with wood for firing the kilns, procured new employees to take the place of the strikers and respondent intermittently continued the operation of its plant with these employees until the strike ended. In the course of the strike, violence of great proportions ensued. Each side procured firearms and kept up a noisy battle day and night without casualties. Respondent secured its firearms at the suggestion on an officer of the Ohio National Guards sent there by the Governor of the State. Most of the strikers and their sympathizers gathered outside the plant and on the road nearby, threw sticks, stones and anything they could lay their hands on at officers and new employees of respondent who were on its premises. Some casualties of a minor nature resulted from the use of the stones and sticks and some damage was done to the property of respondent and there was conflict along the highways between the strikers and officers and employees going to and from respondent's premises. The disorders of the strikers were so great that respondent was compelled to cease operations from May 25, 1938, to and including May 30, 1938.

Between May 24th and June 1st, 1938, the exact date not shown in the record, respondent instituted an action in the civil courts of Ohio to restrain the strikers and their adherents and the Union from invading its property and from assaulting its workers. The action was set down for hearing on June 2, 1938, and notice served on the defendants June 1st. On the night of June 1st, the officers of the Union called a meeting of the strikers at which a majority of those in attendance voted to abandon the strike and about midnight George S. Slyer, Field Examiner for the National Labor Relations Board, notified Carter Abel, respondent's president, that the strike had been abandoned. The reasons stated for the abandonment of the strike were twofold: (1) To avoid a trial of the civil action, and (2) because a full

complement of men had been recruited by respondent for the operation of its plant. On June 2nd, Charles S. Stinson, general organizer for the American Federation of Labor and representing the local union, sent by registered mail to the respondent the following letter:

"Mr. Carter Abel, President,
  "Ohio Calcium Company,
  "Lawrence, Ohio
"Dear Sir:

"This is to confirm statement of Mr. Slyer, representative of the National Labor Relations Board, relative to the action of Local 669, United Brick and Clay Workers Union, in which the Local voted to terminate the strike effective 9 P.M. June 1, and authorized the Committee composed of Fred Martin, Carl Shope and Lester Doughty to inform you that all employees are ready to resume work, status quo.

  "Yours very truly,
  "Charles S. Stinson."

The Board found that respondent's discharge of the eight employees which caused the last strike was fully justified and that they were not discriminated against as alleged in the complaint. The Board further found that the strike grew out of a labor controversy, but that it did not result from any unfair labor practice of respondent as defined in the Act.

However, the Board found that respondent on and after June 2, 1938, had discriminated in regard to the hire and tenure of the striking employees, thereby discouraging membership in a labor organization and that on and after June 2, 1938, respondent had refused to bargain with the Union as representing its employees in the appropriate bargaining unit with respect to wages, hours of employment and other conditions of work and that by such discrimination, refusal to bargain, and other statements and acts during and after the strike of May 24, 1938, respondent had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed under Section 7 of the Act. It further found respondent had discriminated against five employees because of their organizational activities, refusing to employ them from February 8th to February 9th, 1938.

■■ The strikers remained employees under Section 2(3) of the Act, 29 U.S.C.A. § 152(3). National Labor Relations Board v. Mackay Radio & Telegraph Company, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381. The issue of their reinstatement and back pay turns on the question of whether the evidence in the record shows without contradiction or inference that the striking employees were guilty of such unlawful conduct as to terminate their status as such. National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 257, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

■ Respondent insists that none of its striking employees are entitled to reinstatement, because all were members of the Union which initiated and conducted the unlawful strike and further that each was a member of a combination or conspiracy to engage in unlawful conduct. This contention must fail. Members of a Union participating in a labor dispute are not responsible "for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." Sec. 6 of the Norris-LaGuardia Act, 29 U.S.C.A. § 106.

■ The implied termination of an employer-employee relationship, by reason of unlawful conduct in labor controversies applies only to those actually participating in violence and their aiders and abettors. National Labor Relations Board v. Fansteel, supra (op., 306 U.S. 269, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.)

An examination of the record shows that of the forty striking employees ordered reinstated by the Board with back pay, ten had rocks in their hands and were in the picket line, although each denied he threw any rocks.[1] Ten were in the picket line while rocks were being thrown and while disorder was going on.[2] One admitted he had a gun and might have shot it.[3] Sixteen did not testify.[4] One refused to work

---

[1] Floyd Adkins, James Anderson, Ernest Bailey, Martin Butler, Jno. Brannigan, Jr., Martin Butler, Daniel Cameron, John H. Ervin, Roy Kelly, John McCorkle.

[2] George Blagg, Jr., Carl Shope, Herschel Cade, Winfield Claxon, Chas. Ervin, Roy Justice, Estil Middleton, Lee Middleton, Fred Vickers, Joe Atkison.

[3] Fred Martin.

[4] Perry Alridge, Charles Arbough, Harry Bare, Luna Bare, Chas. Cade, Willard Carmon, Frank Depriest, Elroy Dinnen, James Evans, Jno. F. Ferguson, Brooks Goodwyn, Freer Goodwyn, Edwin Sizemore, Perry Willis, Lawrence Young, Charles Ratliff.

on May 22, saying he did not care to "scab."[5] Another who was not working at the time of the strike, being off because of seniority, refused to return to work May 22 on account of the strike.[6]

Carter M. Abel, president and general manager of respondent, testified without contradiction that he saw Perry Alridge, who did not testify, with Dan Cameron, Roy Justice and Roy Kelly attempting to stop a loaded car of lime that the railroad crew was taking from the plant siding. He said they tried to flag the train and that Dan Cameron and Roy Justice were running alongside it with sticks of wood four or five feet long threatening to throw them under the wheels. Cameron, Kelly and Justice all testified but none denied Abel's statement. Abel also stated that Willard Carmon (who did not testify) went with Carl Shope, John Ervin and Charles Ervin and others not identified, to intercept a truckload of material going to Ashland, after Abel stated he had heard Shope say that the "truck would never get to Ashland." Respondent's president also testified he saw Brooks Goodwyn and Freer Goodwyn throwing rocks and Harry Bare and John F. Ferguson with rocks in their hands. Abel also testified he was informed by reliable persons as to violence by all of the ten remaining strikers who did not testify, with the exception of Perry Willis.

■ We are of the opinion that to require respondent to reinstate or re-employ strikers who were in the picket line and who admittedly had rocks in their hands would not be conducive to the promotion of industrial peace but would be punitive action rather than the remedial action contemplated by the Act and would encourage violence in labor disputes. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126. National Labor Relations Board v. Fansteel Corporation, supra. This would seem particularly harsh in view of the finding of the Board that respondent in no way refused to bargain immediately prior to May 22, nor on that date, and further that it fulfilled its duty under the Act to negotiate in good faith with the Union concerning the reinstatement of the eight miners and that the denial of their reinstatement was due to respondent's legitimate position that their services had been terminated for proper cause.

Although the ten striking employees who admitted they had rocks in their hands, testified they did not throw them, the uncontradicted evidence shows that rocks were thrown continuously by strikers at new employees and officers of respondent and that these ten strikers were members of the group who were throwing the rocks.

■■ The Board brushes aside the testimony of Carter Abel as to his personal knowledge of the violence of some of the strikers and also the reliable information he said he had received as to the conduct of all the others except one, on the ground that his statement was general, but in considering his testimony it must be borne in mind that each of the striking employees was an available witness although sixteen of them were not called. The well-known rule is applicable to Abel's testimony that when a party produces such evidence as it is in his power to produce, its probative effect is enhanced by the silence of his opponent and also where the party on whom rests the burden of evidence as to a particular fact has the evidence within his control and withholds it, the presumption is that such evidence is against his interest and insistence. Equipment Acceptance Corporation v. Arwood Can Mfg. Company, 6 Cir., 117 F.2d 442, 443. Those whom he stated he saw doing violent acts testified, but they did not refute what Abel said and some of them were-not asked about their specific acts of violence as testified to by him.

■ There being nothing improbable about the testimony of Abel, and it being substantially supported by other evidence, there is no legal justification for its rejection. Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624. It will thus be seen from the uncontradicted evidence in the record that with the exception of one employee ordered reinstated with pay, all others engaged in acts of violence or aided and abetted others in such conduct.

The Board found that the refusal of respondent to reinstate the striking employees was not due to their violent conduct but rather due to their union affiliation. However, respondent in its answer states that the striking employees engaged in various specified acts of unlawful violence upon and adjacent to its plant, and the Board found that from the time of the entrance of the outside workers into the plant on May

---

[5] Dewey Depriest.

[6] George Shelton.

24th until it closed that night there was sporadic rock-throwing by the striking employees and perhaps by some onlookers. It also found that two employees sustained head injuries and that cars of two or three of the company officials were hit with flying stones and that the kilns were closed around 8:30 or 9:00 o'clock that night because of the disorders. It found that after the non-striking employees and officers left the plant, persons whose names are undisclosed in the record, stoned respondent's offices breaking most of its windows and damaging office furniture. The Board found there "was a great deal of shooting at and from the kilns without damage to persons or property" and that some shooting continued around the plant through June and that occasional shots were fired in the direction of the automobile of respondent's president while he was driving it. It also found shots were fired into the residence of Roy Abel and into the residences of some of the strikers who lived near the plant. The Board nevertheless relieved every striker of responsibility for the disorders and lawlessness.

■■ Under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., employees who strike not as a result of an unfair labor practice on the part of their employer, do so at their peril insofar as compulsory reinstatement is concerned, just as an employer, if he refuses to bargain with representatives of the majority of a proper unit, acts at his peril. National Labor Relations Board v. Brashear Freight Lines, 8 Cir., 119 F.2d 379.

■ The National Labor Relations Act does not destroy the right of an employer to refuse to retain in his employ those employees who engage in unlawful conduct toward him during a strike not caused or prolonged by unfair labor practices of the employer. In recognizing the right to strike the Act envisions a lawful strike and where a strike, even though caused by a labor dispute, is initiated and conducted in lawlessness by destroying or attempting to destroy the employer's property and by physical injury or attempting to injure non-striking employees, those employees engaging in such conduct do not remain employees except at the discretion of the employer, within the meaning of Section 2(3) of the Act and are not within the authority to reinstate "employees" reposed in the Board by Section 10(c). National Labor Relations Board v. Fansteel, supra, (op., 306

U.S. 256, 59 S.Ct. 490, 83 L.Ed. 627, 123 A. L.R. 599); Wilson & Co. v. National Labor Relations Board, 7 Cir., 120 F.2d 913; Standard Lime & Stone Co. v. National Labor Relations Board, 4 Cir., 97 F.2d 531.

■ Viewing the evidence in the light most favorable to the Board's decision and all reasonable inferences to be drawn therefrom, we are of the opinion that all of respondent's striking employees except Perry Willis terminated their employee-employer relationship by reason of their lawlessness during the progress of the strike.

■■ There is no evidence in the record that employee Perry Willis has applied for reinstatement except through the letter of June 2 from Charles Stinson, Union organizer. Willis did not testify and there is no specific evidence in the record that respondent had refused to reinstate him because of union activities. The record is barren of any evidence that Willis took an active part in the strike or was active in the Union. It is unnecessary for an employer to justify his failure to reinstate an employee on some ground other than union activity until it is shown that such employee was refused reinstatement for that reason. In our opinion, the Board's conclusion that Willis was refused reinstatement because of his union affiliation is based on a surmise.

■ The Board's finding that at all times since February 1938, the United Brick & Clay Workers of America, Local 669, has been the duly designated representative of respondent's employees must be rejected in view of the valid change in the situation by reason of the termination of the employer-employee relationship as above stated. The filling of the positions of the striking employees with new ones removes any basis for a conclusion that after the resumption of work Local 669 was the choice of a majority of respondent's employees for the purpose of collective bargaining. National Labor Relations Board v. Fansteel Corporation, supra (op. 306 U.S. pages 261, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599).

The case of the National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380, relied on by petitioner is inapplicable. In that case the Board found that the employees ordered reinstated were on strike as a result of an unfair labor practice of the employer as defined in the Act and that in order to effectuate the policies of the Act, Lorillard must rem-

edy the effect of its prior unlawful refusal to bargain with the Union shown to have had a majority on the date of Lorillard's refusal to so bargain.

In the case at bar, the Board found as a fact that the strike was not called because of any unfair labor practice of respondent and it further found that at all times after April 27, 1938, the respondent had bargained with its employees' representative until the date the strike was terminated. We, having concluded that all the employees except one who had selected a bargaining representative, terminated their employee relationship by reason of unlawful conduct during the strike, and as to the one it not having been shown he was refused reinstatement because of union activities, the rule laid down in the Fansteel case rather than that laid down in the Lorillard case applies here.

The Board found that respondent discriminated against Elroy Dinnen, Fred Martin, Harry Bare, John H. Ervin and John McCorkle, by not employing them from February 8th to 9th, 1938, and ordered respondent to pay to each of them a sum of money equal to the amount he would have earned during that period had he not been discriminated against. On February 7, 1938, before a labor organization existed at respondent's plant, thirteen kiln employees asked respondent's president for an adjustment of some matters they thought were inequitable and he told them he would investigate. The same night an A. F. of L. organizer went to the kilns while the employees were working on the night shift and talked to them about joining the Union. Perry Bailey, assistant superintendent of the kilns, ordered the organizer off the premises. He left and the thirteen kiln employees that night signed up with the A. F. of L., among them the five above mentioned. About eleven o'clock that same night Bailey called respondent's president over the telephone and told him the boys were organizing a union and "raising hell" on the property and that Dinnen was drunk. Respondent's president testified he told Bailey not to interfere with the organization of the Union but told him to cease firing the kilns, and when the midnight shift came on Bailey informed the workers respondent's president was coming out to shut down the kilns. He did come out at 12:30 and ordered them to let the fires go out. Respondent's president testified that the lime burned in the kilns to make Calsifer is perishable and that he shut down this portion of the operations to prevent a loss in case a strike was called.

At 6:00 o'clock p. m., February 8th, operations were resumed, but Chester Bridges, general foreman at the kilns, released Dinnen, Martin, Bare, Ervin and McCorkle. On inquiry that night of respondent's president, organizer Aubin was told that the men were transferred to other shifts and respondent's president testified that was what he had ordered Bridges to do because of some drunkenness and disorder. Carter M. Abel, Jr., vice president of respondent, testified he told Aubin the transfers were made because of disorderly conduct and drunkenness and that Aubin said that was satisfactory. Respondent's president also testified he was endeavoring to sandwich the poorer workers and drinkers with the better workers and men who did not drink, in an effort to improve the standard of work and he thought the men lost no work by the change. The Board found, however, they lost one day's work. Aubin did not testify and Bridges was not asked about the shifting of these five men. Roy Abel, superintendent of respondent, testified there was a discussion about this change before it was made and that it was done for the purpose of increasing the work because there had been a lot of drinking and loafing on the job. There is evidence in the record that respondent's assistant superintendent of kilns stated at the time this incident occurred that respondent would not continue to operate with a union in the plant.

The rule applies that where evidence justifies the finding that the discharge of employees was brought about because of their union affiliation and activity and such conduct on the part of the employer constitutes an unfair labor practice, the Board is warranted in ordering an employer to reinstate employees with back pay. The order of the Board in this particular is supported by substantial evidence, and is sustained.

The provisions of the Board's order contained in paragraphs 1(b), 2(b), 2(f) and 2(g) are sustained, except there will be stricken from paragraphs 2(f), 1(a), 1(c), 2(a), 2(e), and inserted in 2(f) immediately after the phrase "Local 669" the phrase "or any other labor organization." The other provisions of the order are set aside.

A decree may be prepared and entered in conformity with this opinion.