THE PUBLIC UTILITY CONSTRUCTION AND GAS APPLI-
ANCE WORKERS OF THE STATE OF NEW JERSEY,
LOCAL NO. 274, OF THE UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES OF THE PLUMBING
AND PIPE FITTING INDUSTRY, A. F. L., AN UNIN-
CORPORATED ASSOCIATION, AND THOMAS MOORE,
EDWARD SMITH AND GEORGE MOORE, PLAINTIFFS-
RESPONDENTS, v. PUBLIC SERVICE ELECTRIC AND
GAS COMPANY, A NEW JERSEY CORPORATION, DE-
FENDANT-APPELLANT.

Argued December 16, 1957—Decided February 17, 1958.

Mr. *Frederick E. Riethmuller* argued the cause for the plaintiffs-respondents (Mr. *Jacob Friedland,* attorney).

Mr. *Luke A. Kiernan, Jr.,* argued the cause for the defendant-appellant.

The opinion of the court was delivered by

FRANCIS, J. Public Service Electric and Gas Company sought a review in the Appellate Division of the Superior Court of an order of the Law Division directing arbitration of the propriety of its refusal to reinstate Thomas Moore, Edward Smith and George Moore to employment after the settlement of a strike in which they participated. We certified the appeal on our own motion.

Public Service is an electric and gas utility, engaged as such in interstate commerce so as to be subject to the Labor Management Relations Act, 29 *U. S. C. A.* § 141 *et seq.* Plaintiff, The Public Utility Construction and Gas Appliance Workers of the State of New Jersey, Local No. 274, A. F. L. (hereafter called the union), is and has been for some years the representative of certain of the company's employees. The union and the company had entered into a collective bargaining agreement which by its terms expired on July 1, 1953. In anticipation of the expiration, the parties undertook to negotiate with respect to a new contract. Agreement had not been reached on July 1, 1953, but efforts to resolve the differences continued and there was no cessation of employment. However, on November 20 or 28, 1953, a strike began.

The three individual plaintiffs in this action, Thomas and George Moore (who are brothers) and Edward Smith, were members of the union and they joined in the work stoppage. In the early morning hours of December 23, 1953, while the strike was still in progress, the three men broke into the gas meter room in the basement of an apartment at 32 East Palisade Boulevard, Palisades Park, New Jersey, and disconnected and removed therefrom 10 of the 21 meters which served the various tenants of the building. The room was padlocked and entrance was gained by removing the screws which affixed the hasp to the framework. After disconnecting the ten meters, the Moores and Smith carried them out to the street where Smith's car was parked. Four of them were put in the rear seat and six in the trunk.

At this point, the trio were apprehended by the police. Shortly after 10 o'clock on the same morning, the company sent each of them a telegram saying: "You are hereby suspended pending further consideration of your status." Subsequently, on May 13, 1954, they were indicted for unlawful entry and larceny. They were tried on these charges on January 25 and 26, 1955, and the jury, apparently believing their testimony that they did not intend to steal the meters, acquitted them.

On the trial, all three of the strikers admitted their participation in the meter incident. The reason for the unlawful conduct, as given by Thomas Moore, was:

"Well, being that we were out they still had men working doing our work, the inspectors and supervision, so we figured that if they were doing it that we would give them a little more work to do. As long as they were going to do it, we figured that it would help us get back soon if they had the work and couldn't handle it, and that would settle the strike and we would all get back to work again.

Q. What happened after that? Did you actually participate in this idea of disconnecting the meters?

A. Yes, we did.

\*   \*   \*   \*   \*   \*   \*   \*

Q. Was there anything else that you were going to do?

A. Then we were going to call up and say that we were the ones —the people in the apartment that had no gas, so that they would have to get one of their inspectors out of bed to go down and see what was wrong."

According to the arresting officer, who inquired as to where they were going with the meters, "they said that they were going to get rid of them and throw them down the creek." Another officer stated that at police headquarters they told him the intention was to transport them to the Public Service Terminal in Englewood and "toss them over the fence or put them over the fence." The plaintiffs contradicted the officers, testifying that they planned to take the meters to the "gas shop" where they worked and put them on the platform there.

The strike lasted until December 29, 1953, when the negotiations which had persisted eventuated in agreement. While the settlement was being discussed, the matter of reinstatement of the striking employees was a pressing problem. According to the complaint in the present action, which was sworn to by the individual plaintiffs and by Frank De Nike, the business manager of the union,

"Between November 28, 1953, the date when the strike began and December 29, 1953, the ending of the strike, a great number of meetings were held between the parties at the office of the New Jersey State Mediation Board and at these conferences the Union insisted that the three individual plaintiffs be reinstated to their jobs."

However, they were not reinstated. The written agreement of settlement provided:

"*E.* All employees, *except as hereinafter provided*, shall be returned to work on December 30, 1953 at their regular reporting time. (Emphasis added)

*F.* Francis C. Juillet may have the propriety of his discharge submitted to Arbitration in accordance with the rules of Arbitration of the New Jersey State Board of Mediation. [We were told at the oral argument that this discharge occurred before the strike.] * * * The same shall apply to the suspension of Thomas Moore, George Moore and Edward Smith. Requests for such arbitration must be filed 10 days from date hereof. (Insertion ours)

*G.* John Ragan, Jr., currently suspended shall be reinstated to employment until such time as the charges currently filed against him in the Municipal Court in Paterson are determined. In the event he is convicted of such charges, he shall be deemed automatically discharged and in the event he is acquitted of such charges, he shall continue his employment."

The framework and language of this portion of the compact is significant. As is usual at the end of a strike, a question arose as to reinstatement of the striking employees. It was agreed that all of them would be returned to work the next day except the Moores and Smith, the dischargee Juillet, whose reinstatement depended on the outcome of arbitration, and Ragan, who was reinstated immediately pending the outcome of criminal charges open against him in a local municipal court. The parties were aware of the arrest of the plaintiffs for the meter sabotage, but they were accorded different treatment from Ragan. No provision was made for their immediate reinstatement, nor for reinstatement if they were acquitted or obtained a dismissal of the criminal complaint. Manifestly, their return was to depend upon the outcome of the arbitration of the propriety of their suspension. An awareness of the well known legal principles controlling reinstatement at the termination of a strike (to be discussed hereafter) and an appreciation of the next paragraph of the contract, make this conclusion clearly evident. Paragraph H says:

"Both parties agree that *all* differences between them have been settled on the basis above mentioned and that there shall be no

claims or litigations between the Company and the Union as the result of the strike." (Emphasis added)

As has been indicated, the settlement agreement was signed on December 29, 1953. Presumably the plaintiffs' requests for arbitration of their suspensions were filed within ten days as required. But the hearing, inexplicably, was not moved until May 3, 1955. Perhaps the reason can be found in the action of the union at that time in announcing that it would not contest the propriety of the suspensions.

On May 3 the parties appeared at the New Jersey State Board of Mediation for the arbitration proceeding. Before the hearing plaintiffs asked for reinstatement and the company refused. The question to be determined by the arbitrators was then stipulated as follows:

"The propriety of the suspension of Thomas Moore, George Moore and Edward Smith by their employer on December 23, 1953, is the issue before the panel."

Prior to the taking of any testimony counsel for the union advised the panel that the union would not contest the validity of the suspensions but believed that the men should be returned to work. However, the panel in its ultimate ruling declared that the issue before it was limited to the matter of the suspensions. The hearing then proceeded and testimony was taken. Thereafter, on May 11, 1955, a unanimous decision that the suspensions were proper was issued.

On May 4, 1955, as the result of the request for reinstatement made on the previous day, the company wrote plaintiffs advising them that:

"Your representative previously has been informed that in our opinion your actions of December 23, 1953 were such as to disqualify you for employment with this Company. We advised him that under no circumstances would we *reinstate* you. Your recent application does not change the situation, and our decision not to *reinstate* you stands." (Emphasis added)

On May 6 the business manager of the union (who was a member of the arbitration panel which five days later

sustained the suspensions) sought to treat the letter of May 4 as a *discharge* and demanded that the matter be processed as a grievance under the collective bargaining agreement then in force or under the one which was renewed after the strike. The company replied on May 9 that:

"Since the men in question have admittedly engaged in unprotected activity during the course of the strike * * * by maliciously sabotaging Company property and facilities, please be advised that the Company, as it has indicated on two previous occasions, has taken the position that the men in question will not be *reinstated*." (Emphasis added)

As was noted above, the contract between the union and the company had expired some months prior to the strike. It contained a clause establishing grievance and arbitration procedure for use by an employee who was disciplined or discharged. The settlement agreement, in referring to that contract, said:

"1. The Agreement which expired July 1, 1953 will be amended as follows:"

Then followed some stipulations relating to work conditions, wage increase, and the matters already referred to dealing with the discharged and suspended employees. And finally it provided:

"1. All other terms and conditions of the Agreement between the parties which *expired* July 1, 1953, shall be effective to June 30, 1954." (Emphasis added)

Plaintiffs contend that the effect of the language employed was to revive the expired contract so as to make it retroactively operative to July 1, 1953. It is not necessary to decide that question because the rights of these parties must be deemed to have been adjusted by the settlement agreement of December 29, 1953. And the wording of that document, interpreted in the light of the factual and legal relations between the parties as they then existed, leaves no doubt as to its import.

■ In any event, when the company declined to arbitrate the so-called discharge, the present complaint was filed under *N. J. S.* 2A:24–1 *et seq.* to compel submission to that process. After consideration of the pleadings and affidavits of the parties, the Law Division held that during the strike the plaintiffs occupied the status of suspended employees, that under the settlement they remained in that position until the arbitration determination of May 11, 1955, and that when the employer refused to reinstate them thereafter, they became dischargees for the first time. The court also concluded that the effect of the settlement agreement was to revive retroactively the expired union contract so as to make its grievance mechanisms available to the plaintiffs. Consequently, he directed the company to proceed to arbitration on the discharge issue.

The order has some surface appeal. However, its aspect of soundness disappears upon analysis. In order to gain perspective for proper consideration of the matter, we must retreat to fundamental principles governing labor-management relations.

■ Strikers do not lose their standing as employees during the continuance of a strike. *Browning King Co. of N. Y. v. Local 195*, 34 *N. J. Super.* 13, 26 (*App. Div.* 1955); 29 *U. S. C. A.* § 152. And at the conclusion of the strike, ordinarily they have the right of reinstatement to their former duties. Some well recognized qualifications exist. If the strike is an economic one (as it was here), they are entitled to reinstatement to the extent that their places have not been filled during the strike; if all of them have been replaced, there is no obligation on the employer to discharge the new workers in order to restore the strikers to their posts. On the other hand, if the work stoppage is produced by the employer's unfair labor practices, the strikers have the right of reinstatement even though they have been replaced. Failure or refusal on the part of a subject employer to reinstate them would be violative of the Labor Management Relations Act and would call for a remedial order by the National Labor Relations Board.

And whether the strike was an economic or an unfair practice one, such an order would issue against an employer who engaged in discrimination in the process of restoring the men to their employment. *N. L. R. B. v. Mackay Radio & Telegraph Co.*, 304 *U. S.* 333, 58 *S. Ct.* 904, 82 *L. Ed.* 1381 (1938); *N. L. R. B. v. Ohio Calcium Co.*, 133 *F. 2d* 721, 726 (6 *Cir.* 1943); *N. L. R. B. v. Remington Rand, Inc.*, 130 *F. 2d* 919 (2 *Cir.* 1942); *Wilson & Co. v. N. L. R. B.*, 120 *F. 2d* 913, 924 (7 *Cir.* 1941); *Busch & Sons v. Retail Union of N. J., Local 108*, 27 *N. J. Super.* 432, 439 (*App. Div.* 1953), reversed on other grounds 15 *N. J.* 226 (1954); *Teller, Labor Disputes and Collective Bargaining* (1940), § 318; *C. C. H. Labor Law Reporter* § 4735; *The Fansteel Case*, 52 *Harv. L. Rev.* 1275, 1301 (1939).

But regardless of the nature of the strike, the right of reinstatement is lost if the strikers engage in unlawful conduct, such as serious violence against the person of nonstrikers or the property of the employer; seizure of or improper trespass on or against, or unlawful interference with, the employer's property; sabotage, or mass picketing; or if the strike itself is unlawful. *N. L. R. B. v. Fansteel Metal. Corp.*, 306 *U. S.* 240, 59 *S. Ct.* 490, 83 *L. Ed.* 627 (1939); *United Steelworkers of America, C. I. O. v. N. L. R. B.*, 100 *U. S. App. D. C.* 170, 243 *F. 2d* 593, 31 *Labor Cases* 92,811 (1956), *certiorari* granted 353 *U. S.* 921, 77 *S. Ct.* 682, 1 *L. Ed. 2d* 719 (1957); *N. L. R. B. v. Marshall Car Wheel & Foundry Co.*, 218 *F. 2d* 409 (5 *Cir.* 1955); *N. L. R. B. v. Cambria Clay Products Co.*, 215 *F. 2d* 48 (6 *Cir.* 1954); *N. L. R. B. v. Clearfield Cheese Co.*, 213 *F. 2d* 70 (3 *Cir.* 1954); *N. L. R. B. v. Thayer Co.*, 213 *F. 2d* 748 (1 *Cir.* 1954), *cert. den.* 348 *U. S.* 883, 75 *S. Ct.* 123, 99 *L. Ed.* 694 (1954); *Rubin Bros. Footwear, Inc. v. N. L. R. B.*, 203 *F. 2d* 486 (5 *Cir.* 1953); *N. L. R. B. v. Longview Furniture Co.*, 206 *F. 2d* 274 (4 *Cir.* 1953); *Id.*, after remand, 110 *N. L. R. B.* 1734 (1954); *N. L. R. B. v. Hart Cotton Mills*, 190 *F. 2d* 964 (4 *Cir.* 1951); *In re River Falls Cooperative Creamery*, 90 *N. L.*

R. B. 257 (1950); *N. L. R. B. v. Kelco Corporation,* 178 *F. 2d* 578 (4 *Cir.* 1949); *N. L. R. B. v. Wytheville Knitting Mills, Inc.,* 175 *F. 2d* 238 (3 *Cir.* 1949); *N. L. R. B. v. Mt. Clemens Pottery Co.,* 147 *F. 2d* 262 (6 *Cir.* 1945); *N. L. R. B. v. Indiana Desk Co.,* 149 *F. 2d* 987 (7 *Cir.* 1945); *N. L. R. B. v. Draper Corporation,* 145 *F. 2d* 199 (4 *Cir.* 1944); *N. L. R. B. v. Clinchfield Coal Corp.,* 145 *F. 2d* 66 (4 *Cir.* 1944); *N. L. R. B. v. Ohio Calcium Co., supra; Wilson & Co. v. N. L. R. B., supra; McNeely & Price Co. v. N. L. R. B.,* 106 *F. 2d* 878 (3 *Cir.* 1939); *Standard Lime & Stone Co. v. N. L. R. B.,* 97 *F. 2d* 531, 535 (4 *Cir.* 1938); *The Fansteel Case,* 52 *Harv. L. Rev., supra; Matthews, Labor Relations and the Law* (1953) 733–742; *C. C. H., supra* §§ 4735, 4070, *p.* 4392, *et seq.* Reference is made to the large number of cases only to illustrate the varied types of misconduct which cause forfeiture of the right of restoration to work.

*N. L. R. B. v. Fansteel Metal. Corp., supra,* [306 *U. S.* 240, 59 *S. Ct.* 495] contains the source material to which all of the cited decisions turn for authority. There, Chief Justice Hughes said:

"The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.

\*        \*        \*        \*        \*        \*        \*        \*

It is apparent under that construction of the Act that had there been no strike, and employees had been guilty of unlawful conduct in seizing or committing depredations upon the property of their employer, that conduct would have been good reason for discharge \*   \*   \*.

\*        \*        \*        \*        \*        \*        \*        \*

We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the em-

ployer's property, which they would not have enjoyed had they re-mained at work.

\*   \*   \*   \*   \*   \*   \*   \*

It was an illegal seizure of the buildings in order to prevent their use by the employer in a lawful manner and thus by acts of force and violence to compel the employer to submit. When the employees resorted to that sort of compulsion they took a position outside the protection of the statute and accepted the risk of the termination of their employment upon grounds aside from the exercise of the legal rights which the statute was designed to conserve.

\*   \*   \*   \*   \*   \*   \*   \*

There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. \* \* \* We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts which the Board finds to have been committed in this instance would not only not effectuate any policy of the Act but would directly tend to make abortive its plan for peaceable procedure."

Thus, when plaintiffs here engaged in the unlawful activity described while they were on strike, it was not necessary for the employer to suspend them immediately. They were not actively engaged in employment and were not receiving wages. By their conduct they had removed themselves from the protective limits of the Labor Management Relations Act and had forfeited any right they possessed to be reinstated. The matter could have been permitted to rest until the conclusion of the strike and then handled by a refusal to reinstate. However, problems of discipline and the taking of immediate measures to discourage similar depredations during a strike rest in the discretion of the employer. But plainly the fact that plaintiffs were suspended immediately rather than dealt with on the cessation of the strike, did not improve their position with respect to re-instatement.

It is not necessary for the employer to immediately and expressly discharge strikers when they engage in such illegal practices. Failure or refusal to reinstate them on the adjustment of the strike constitutes and is treated as an implied discharge. *N. L. R. B. v. Fansteel Metal. Corp., supra,* 306 *U. S.* at *pages* 259–261, 59 *S. Ct.* at *pages*

497–498; *N. L. R. B. v. Ohio Calcium Co., supra,* 133 *F. 2d* at *page* 726; *McNeely & Price Co. v. N. L. R. B., supra.* (In instances of economic strikes where strikers have been replaced, failure or refusal to reinstate has been denominated a "constructive" discharge. *In re Valley City Furniture Co.,* 110 *N. L. R. B.* 1589 (1954)). It has been suggested that this is a better time to consider the matter. 52 *Harv. L. Rev., supra,* at *pages* 1316–1317. However, the law does not impose any such obligation but leaves the problem to the discretion of the employer.

When the strike ended, plaintiffs had no right to reinstatement. The fact is not disputed. In their brief they say:

"Here there is no allegation that the Defendant committed an unfair labor practice in failing to reinstate the Plaintiffs or that the Plaintiffs are entitled to reinstatement as a matter of right under the provisions of the Labor Management Relations Act. * * *."

Any consideration they received at that time rested in the discretion of the company. *Wilson & Co. v. N. L. R. B., supra,* 120 *F. 2d* at *page* 924; *N. L. R. B. v. Ohio Calcium Co., supra,* 133 *F. 2d* at *page* 728. Although during the negotiations the union sought their reinstatement as an incident of the settlement, they were not taken back. The only provision made for them was that the propriety of their suspension would be arbitrated. This represented a concession and in the light of their status it marked the full limits of the employer's agreement and obligation with respect to them. As the Supreme Court said in the *Fansteel* case:

"The important point is that respondent stood absolved by the conduct of those engaged in the 'sit-down' from any duty to re-employ them, but respondent was nevertheless free to consider the exigencies of its business and to offer reemployment if it chose. In so doing it was simply exercising its normal right to select its employees." (306 *U. S.* at *page* 259, 59 *S. Ct.* at *page* 497).

Of course, if plaintiffs were entitled to reemployment and the company failed to recognize it, a complaint to the

National Labor Relations Board would have produced a speedy remedy. Or if the arbitration of the suspension had resulted adversely to the employer, refusal to permit them to resume work would have constituted the forbidden discrimination spoken of in *N. L. R. B. v. Mackay Radio & Telegraph Co., supra,* as well as an unfair labor practice under the Labor Management Relations Act.

Plaintiffs showed no desire to proceed expeditiously to arbitration. They were aware of their situation and of the effect of their admitted course of conduct. Although the settlement agreement was executed on December 29, 1953, the arbitration hearing was not held until May 3, 1955, almost 17 months later. And at the trial of the criminal indictment, when Thomas Moore was asked if he was working then for the Public Service, he said: "No, after what happened, we were suspended, fired."

The arbitration proceedings were moved about five months after the criminal trial. It seems fair to assume that the acquittal stimulated some hope for another favorable result. However, as has been indicated, the union announced that it would not contest the propriety of the suspensions and the hearing sustained the position of the company.

Just before the hearing, the union representative asked for plaintiffs' *reinstatement.* On being refused, he and they began to treat the refusal as a discharge and demanded pursuit of the grievance machinery and arbitration with respect to the "discharge." But at the end of the strike, they had lost their employment rights. Nothing survived to them except what the employer in his discretion granted, *i. e.,* arbitration of the propriety of the suspension.

Acquittal of the criminal charges did not improve their legal position. Conviction is not necessary in such cases. As was said in *N. L. R. B. v. Kelco Corporation, supra,* [178 *F. 2d* 580] in overruling the contrary notion of the Board:

"This, we think, is an erroneous view of the law. It is not the fact that employees have been convicted of crime that renders them ineligible for reinstatement, but the fact that they have been guilty of unlawful conduct which would make their presence un-

desirable because of the disruptive effect which it would have upon the employer's business. To order the reinstatement of employees who have been guilty of such serious acts of violence, whether followed by criminal convictions or not, cannot reasonably be said to be proper action to 'effectuate the policies of this act' within the meaning of sec. 10(c), 29 *U. S. C. A.* § 160(c)."

Nor did the length of time which had elapsed between the end of the strike and the arbitration hearing alter the status of the plaintiffs. During the 17 months they had never been permitted to resume work and only a favorable outcome of the hearing could bring about their reinstatement. The adverse judgment left them as they were at the end of the strike, *i. e.*, strikers who had forfeited their right of reinstatement by unlawful conduct. There could not have been a discharge in May 1955; there was no employment relation at that time beyond the tenuous thread provided by the stipulation to arbitrate the propriety of the suspension. In this connection it cannot escape notice that on May 18 plaintiff Smith filed with the National Labor Relations Board a charge of unfair labor practice against the company based upon an allegation that he was discharged on or about May 9, 1955. About a month later he was permitted to withdraw it without prejudice by the Regional Director. In Smith's affidavit in this action, referring to the withdrawal, he said:

"It is true that on May 18, 1955 I filed charges with the National Labor Relations Board against the defendant, being under the impression that the defendant might have committed unfair labor practices by refusing *to reinstate us* in May 1955. After speaking to the Trial Examiner to whom the case was referred and being advised by him that the General Counsel for the National Labor Relations Board would not entertain a complaint against the defendant on our behalf, I withdrew the charges shortly thereafter."

Our study of the record has convinced us that the future relationship of plaintiffs and the company was intended to depend, and did depend under the agreement of December 29, 1953, upon the outcome of the arbitration of the propriety of the suspension. The determination against plaintiffs left them without any rights as employees.

█ The additional argument has been presented to us by the company that the National Labor Relations Board has exclusive jurisdiction over this controversy. It is fundamental that arbitration provisions in a bargaining agreement cannot oust the Board's jurisdiction to prevent unfair labor practices. *Guss v. Utah Labor Relations Board*, 353 *U. S.* 1, 77 *S. Ct.* 598, 1 *L. Ed. 2d* 601 (1957); *N. L. R. B. v. Wagner Iron Works, etc.*, 220 *F. 2d* 126, 137 (7 *Cir.* 1955); and see *A. E. Nettleton Co. v. United Shoeworkers, etc.*, 138 *N. Y. S. 2d* 256 (*Sup. Ct.* 1955); *In re United Steel Workers of America, C. I. O.*, 206 *Misc.* 193, 134 *N. Y. S. 2d* 634 (*Sup. Ct.* 1954); *Benedict v. Limited Editions Club, Inc.*, 265 *App. Div.* 518, 39 *N. Y. S. 2d* 852 (*App. Div.* 1943). However, whether the present controversy is within the ambit of our Superior Court's authority by reason of its somewhat unusual factual framework need not be decided in view of the result already reached.

The order compelling the defendant to proceed to arbitration is reversed and the matter is remanded with directions to dismiss the complaint. No costs.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—None.