**NATIONAL LABOR RELATIONS BOARD**

v.

**CLEARFIELD CHEESE CO., Inc.**

**No. 11249.**

United States Court of Appeals
Third Circuit.

Argued April 22, 1954.

Decided May 7, 1954.

Rehearing Denied June 2, 1954.

Bernard Dunau, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Owsley Vose, Melvin Pollack, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Gerard D. Reilly, Washington, D. C. (Smith, Maine, Whitsett & Lee, Clearfield, Pa., Reilly, Rhetts & Ruckelshaus, Washington, D. C., Frank A. Whitsett, Clearfield, Pa., Charles E. Hewes, Wash-

ington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The Board's order of July 29, 1953, which it is petitioning to have enforced, is based on its decision of that same date (106 N.L.R.B. No. 80). In the latter the Board agreed with the Trial Examiner on the first point involved, namely, that respondent had interfered with, restrained and coerced its employees in violation of Section 8(a)(1) of the National Labor Relations Act as amended, 29 U.S.C.A. § 158, through certain acts and conduct of its three principal foremen.

The events with which we are concerned began in August, 1951. Up to that time respondent's plant had never been unionized though the year previously there had been an unsuccessful effort along that line. In August of 1951 another such attempt was made. After some preliminary steps there was a union organization meeting held on August 20, 1951. Within five days after that there was a meeting of respondent's employees at the plant office. Imler; Krolick and Duke, the three foremen above referred to, were admittedly present. There is testimony that among other things Imler told the meeting he understood the employees were trying to bring a union in; that " * * * they [respondent] have something good to offer us if we would form our own union." This is amply corroborated though Imler denied it. Imler also denied planning the meeting but he does say that he obtained permission for it from Hamer Tate, respondent's secretary-treasurer. The employees present were paid for their attendance time. No similar meeting had ever been held at the plant. There is adequate support in the record for the Board's affirmation of the Trial Examiner's finding that at the meeting respondent did, through foreman Imler, " * * * solicit its employees to establish a separate representation committee or labor organization for the purpose of dealing with Respondent in place of the Union."

There was other testimony which the Examiner believed and the Board accepted that shortly prior to the meeting Imler asked two employees why they wanted to have a union, that he told them they " * * * should go to Mr. Tate and see what he had to offer us * * * that Mr. Tate asked us to come * * *." Read, one of the two employees, stated that "Imler wanted us to go on a company plan for three months and then change over if we didn't like it." Imler, said another employee, told him that a company union would be more helpful than the outside union then organizing and that if the latter came in the company would probably move its plant to Clinton, Missouri. An employee named Wilkinson testified that Imler asked him and a fellow employee if they didn't think they should join a company union. Much the same sort of evidence was given regarding Krolick's activities. R. T. Russell, an employee, stated that Krolick said " * * * the company could take away our Christmas war bond if we went into a union". Oral Bauman stated that in response to Krolick's query as to what he thought of the union he said: "In my experience I thought it was best for both." Krolick replied, "Well, you are going to be sorry because the company, if you organize, are going to move out * * * Then what are you going to do. You won't have no employment."

There is evidence of other incidents occurring after the strike (which started October 19, 1951) had begun. Clair Williams said that approximately a week after the commencement of the strike Hamer Tate and Imler came to his house and tried to persuade him to return to work, explaining how they would take him in one of their cars. On October 29, 1951 respondent sent letters to three employees saying that the company considered them valuable employees, wished them to return to work by November

1st and if they did not return by that date their employment would be terminated.

Finally, on this phase of the case, after the strike had ended, employee Roxie Newpher was given a job at her former rate. After that, according to her, Imler and Hamer Tate intimated that she could have steady work if she would withdraw certain charges she had made against Foreman Krolick which Tate said would hurt only the company.

■■ Respondent argues that Imler's remarks at the employees' meeting did not breach section 8(a)(1). Those remarks, as appearing in the testimony believed by the Board, did contain promise of benefit and Imler's statements to individuals prior to the meeting just as clearly presented the definite threat of the company moving away if the attempted unionization became effective. The evidence as to Krolick was at least as strong. The Board was justified in concluding that the statements of Messrs. Imler and Krolick were not casual or isolated remarks but reflected the views of the management. N.L.R.B. v. Kanmak Mills, 3 Cir., 1952, 200 F.2d 542, 543–544; N.L.R.B. v. Epstein, 3 Cir., 1953, 203 F.2d 482, 484 certiorari denied 347 U.S. 912, 74 S.Ct. 474.

■ The endeavors of respondent to have employees return to work during the strike afforded a sound basis for the Board's conclusion that Section 8(a)(1) had been breached by respondent because " * * * such solicitation was calculated to undermine the Union" at a time when the latter was the majority representative as the Board found. N.L.R.B. v. Spiewak, 3 Cir., 1949, 179 F.2d 695, 696–697. The testimony dealing with the Roxie Newpher episode considered credible by the Board is sufficient to sustain the finding that there also respondent was guilty of an 8(a)(1) violation.

In that instance there was a definite representation of steady employment if the labor charges were withdrawn. N. L.R.B. v. Nina Dye Works, 3 Cir., 1953, 203 F.2d 849, 851, certiorari denied 346 U.S. 875, 74 S.Ct. 127.

*Respondent's Refusal to Bargain with the Union*

■ On August 28, 1951 Gaston LeBlanc, who was assisting in the organization of the union, had a talk with Frank Smith, Esq., attorney for the respondent to whom he had been directed by the secretary-treasurer of the company. He testified he told Mr. Smith that he had a majority and suggested " * * * since he was handling the thing could we get together and agree on recognition, either by check of cards or drafting a stipulation to that effect and identifying the cards, and then, of course, what would be the details concerning our getting together to negotiate an agreement." LeBlanc says that Smith refused stating that the company would not recognize the union unless there should be an ordered election. At that time there were not more than sixty-six employees in production and maintenance. The Trial Examiner excluded two of these as high school students hired on a temporary basis. Marked in evidence are at least forty authorization cards found by the Trial Examiner to have been executed by employees prior to August 28, 1951. So that when LeBlanc talked with Smith the union did have a majority of the production and maintenance people.[1] On September 5, 1951 the union filed a petition alleging that it represented the majority of respondent's production and maintenance workers. This was heard by the Board on October 15th. At that hearing respondent while it questioned the union majority, did not object to the appropriateness of the unit as urged by the union.[2]

1. It might be noted that the Examiner found other cards signed in September and that the union had obtained a total of approximately fifty cards by October 1, 1951.

2. On November 16, 1951 the Board issued a Decision and Direction of Election in that certification proceeding. On December 7, 1951 the motion of the union to withdraw its petition was allowed by the

There is nothing in the record to validly support respondent's contention that the request for recognition was inappropriate as it did not specify a clearly identified bargaining unit. The only figure we find stated for the total number of respondent's employees is the one asserted by respondent as at the present, namely, about eighty-eight persons. Of those it is said that at the time of the hearing in this case seventy-one were in the production and maintenance department. Since in the latter part of August, 1951 the number of production and maintenance employees was around sixty-six it would seem that the total employees during that period was even less than is now given. In any event the production and maintenance department unquestionably included most of respondent's employees. There is no rational foundation for assuming that Smith and Tate were confused by the request for recognition or rejected it in good faith because they failed to understand its scope. If the problem of appropriateness of the unit had been seriously in their minds a simple query of LeBlanc or examination of the cards would have been indicated.

■ The Trial Examiner finding a lack of good faith in respondent's position in insisting upon a Board conducted election before it would recognize and meet with the union representatives, held it had thereby violated Section 8(a)(5) of the Act. The Board agreed with the Examiner. On the whole record there was substantial support for the conclusion that there was lack of bona fide doubt by the respondent of the union's majority. N.L.R.B. v. Epstein, supra. In view of the clear majority shown by the authorization cards it is difficult to explain away the refusal of respondent to even check them. These facts go much further than those in N.L.R.B. v. Trimfit of California, Inc., 9 Cir., 1954, 211 F.2d 206. There the court held, at p. 210 that "There was no necessity for the union to offer proof of the genuineness of its majority claim absent a challenge by respondent." And see Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732.

### The Strike

■ We are satisfied that the record upholds the Board's finding that the basic cause of the strike was respondent's refusal to bargain. Since this made it an unfair practice strike the employees participating in it were entitled to reinstatement upon application irrespective of whether they had been replaced.

■ The strike began October 17, 1951. On the 19th respondent sent a letter to all of the strikers.[3] Under the circumstances the Board could lawfully decide as it did that by the letter respondent discharged the strikers and that its action was in violation of Section 8(a)(3) and (1) of the Act. The employees had a right to strike in order to obtain recognition of their bargaining representative and they were protected in that right from discharge. N.L.R.B. v. Poultrymen's Service Corporation, 3 Cir., 1943, 138 F.2d 204; Great Southern Trucking Co. v. N.L.R.B., 4 Cir., 1942, 127 F.2d 180, 186–187, certiorari denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524.[4]

### Reinstatement of the Strikers

It necessarily follows from the above that under ordinary circumstances the

Board. The pendency of that petition at the time of the strike did not render the latter unlawful. N. L. R. B. v. Crowley Milk Co., 3 Cir., 1953, 208 F.2d 444, 446.

3. The letter reads:
"Without any notice to us, you voluntarily quit your employment with this company and walked off the job on Wednesday, October 17th, 1951.
"If you do not make application for reemployment on or before Monday, October 22nd, we will consider that you are not interested in being reemployed by this company.
"On account of your action, certain of our business has been cancelled, and we may not be able to reemploy you all. We intend to employ those who first apply and are qualified for the jobs that are open.
"Clearfield Cheese Co., Inc."

4. Admittedly when the letters of October 19th were written and received there had been no replacements of strikers. Even

Board would be well within its statutory authority in ordering reinstatement of the discharged strikers with back pay. However with reference to all of the strikers it was contended before the Board and is pressed in this proceeding that their misconduct on the picket line calls for denial of their reinstatement. The Trial Examiner after painstakingly examining the evidence concluded that twenty-one of the strikers had been sufficiently identified as participants in picket line misconduct as to warrant denying them reinstatement. Regarding those of the remaining strikers whose conduct was particularly questioned the Examiner found they had done nothing to disqualify themselves for reinstatement and were eligible and entitled to reinstatement and back pay. The Board approved that finding. It is justified by the record.

The Board in its decision does not dispute the Examiner's conclusion that the twenty-one strikers had so misconducted themselves that they had forfeited their right to restoration to active status with back pay. But, holds the Board, the employer condoned their conduct and therefore the disqualification was removed. The Board's thought is that respondent condoned the misconduct (1) by failing to mention it at any time during the otherwise lawful strike as a reason for not taking back its employees; and (2) in indicating that it would "reinstate" the strikers to available positions irrespective of their behavior.

▇▇▇▇ Reinstatement was never offered by respondent. Orally and in writing it emphasized that any hiring would be solely on a new employee status. The misconduct by the strikers, as the Examiner states, was that they " * * physically barred all entrances to the plant in such a manner that for the non-strikers there was 'an effective implied threat of bodily harm * * * should they risk entering the plant'. Socony

if the strike had been economic respondent could not discharge its striking employees until they had been replaced. N.

Vacuum Oil Company, Inc., 78 N.L.R.B. 1185, 1186." That action was directly opposed to the force and violence prohibition of the Act. It was for that reason the reinstatement rights of the strikers in question were forfeited. N.L.R.B. v. Fansteel Corporation, 306 U.S. 240, 258, 59 S.Ct. 490, 83 L.Ed. 627; McNeely & Price Co. v. N.L.R.B., 3 Cir., 1939, 106 F.2d 878, 880. Where the employer sees fit to waive its rights to terminate because of misconduct the employment of particular employees it can hardly be assumed to have foreclosed itself from rejecting any other employees in the same category. What the Supreme Court said in Fansteel, supra, 306 U.S. at page 259, 59 S.Ct. at page 497, applies to the situation before us:

> "The important point is that respondent stood absolved by the conduct of those engaged in the 'sit-down' from any duty to reemploy them, but respondent was nevertheless free to consider the exigencies of its business and to offer reemployment if it chose. In so doing it was simply exercising its normal right to select its employees."

The reinstatement with back pay of the twenty-one employees listed in the Board's appendix B is denied.

▇▇▇ Respondent contends that its offers of reemployment and the actual reemployment of several strikers eliminate back pay from the date of the offers to those employees. We think the Trial Examiner's finding affirmed by the Board is sound, namely, that there were no valid offers of reinstatement and that the rights of the eligible strikers to be made whole for the discrimination practiced against them were not affected by such offers of reemployment as respondent made after the strike had ended.

The order of the Board as modified by this opinion will be enforced. Proposed decree to be submitted.

L.R.B. v. Kennametal, Inc., 3 Cir., 1950, 182 F.2d 817; Cusano v. N.L.R.B., 3 Cir., 1951, 190 F.2d 898, 901–902.