## NATIONAL LABOR RELATIONS BOARD

v.

## MARSHALL CAR WHEEL AND FOUNDRY CO. OF MARSHALL, TEXAS, Inc.

No. 14947.

United States Court of Appeals, Fifth Circuit.

Jan. 7, 1955.

Bernard Dunau, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, George J. Bott, Gen. Counsel, William J. Avrutis, National Labor Relations Board, Washington, D. C., for petitioner.

Joseph A. Jenkins, J. A. Gooch, Cantey, Hanger, Johnson, Scarborough & Gooch, Rawlings, Sayers, Scurlock & Eidson, Fort Worth, Tex., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The Board petitions for enforcement of its order issued against respondent

on May 28, 1953, based on findings that respondent had discriminatorily discharged certain of its striking employees and denied others full reinstatement privileges because of their prior concerted activity. The decision and order of the Board are reported in 105 N.L.R.B. 132.

Respondent is a Texas corporation with principal offices and plant at Marshall, Texas, where it employs over 200 workers in the operation of an iron foundry. It manufactures and sells in interstate commerce car wheels, pipe and related products.

Pursuant to a Board conducted election held on August 15, 1951, at which the charging union prevailed,[1] the Board certified the union on August 23, 1951 as the exclusive bargaining representative of respondent's employees in the appropriate unit.[2] Thereafter, the union sought to institute bargaining negotiations, but shortly became dissatisfied with the progress made, principally because of the alleged discriminatory layoff of eleven employees, respondent's further failure to accede to its wage demands, and the union's inability to arrange bargaining meetings to its satisfaction with respondent's attorney-representative, J. A. Gooch. Because of these grievances, a strike was voted by the employees at the union meeting held on the evening of October 15. At 11 A.M. the following day, in accordance with their predetermined plan, approximately 45% of respondent's employees then at work walked out of the plant. It is practically undisputed that the striking employees intentionally chose a time for their walkout when molten iron in the plant cupola was ready to be poured off,[3] and that a lack of sufficient help to carry out the critical pouring operation might well have resulted in substantial property damage and pecuniary loss to respondent, though it was further shown that certain employees, who did not honor the strike, together with respondent's supervisory staff, were able to pour off the molten metal and prevent any actual damage.

The union representative, J. A. Lee, arrived in town shortly after the employee walkout at 11 A.M. and tried unsuccessfully to telephone respondent's vice president and general manager, Emory E. Fry. When Fry returned Lee's call around noon, Lee requested him to meet with the union committee to discuss the alleged discriminatory layoffs, and further offered to return a number of the strikers to help pour the molten lead from the cupola and relieve the emergency situation created by the employee walkout. Fry, who was then quite understandably engaged in pouring molten metal, declined the belated offer of help. Even in the emergency situation, however, Fry stated respondent's position with respect to reinstatement of the striking employees substantially as follows: that because of their violation of respondent's "long-standing rule" prohibiting employees from leaving the plant "without notice and permission", they had, in effect, quit their employment; that whether they would be permitted to return "was strictly up to the foreman"; and that, if they were taken back, "they would have to come back as

1. The union here involved is United Steel Workers' of America, CIO.

2. The Trial Examiner's finding is undisputed that "all production and maintenance employees of Respondent employed at its Marshall, Texas, plant, exclusive of office and clerical employees, guards and watchmen, professional and supervisory employees as defined in the Act, constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act [29 U.S.C.A. § 159(b)]."

3. As graphically explained by Chairman Guy Farmer dissenting:

"In connection with its manufacturing operations, the Respondent operates a foundry. It melts iron in a cupola or furnace. The hot molten metal is tapped into a bull ladle for cooling and then poured into smaller ladles for transportation to other parts of the plant where it is poured into molds. About 11 A.M. each morning, the cupola is full of molten metal and must be emptied immediately or severe damage to plant and equipment will result."

new employees". According to further findings, to which the Board attached crucial significance, Fry did not specifically mention either then, or in a later telephone conversation with Lee that afternoon,[4] that the risk of property damage occasioned by the precipitate nature of the walkout during a critical stage of respondent's manufacturing process was the underlying reason for respondent's refusal to permit return of the strikers except "as new employees".

Following the abortive strike, the union set up a picket line at respondent's plant, and on October 17th and 18th wrote respondent letters restating Lee's prior unconditional offer to return the striking employees to work. In spite of repeated efforts, both by the union and the individual strikers, to secure their unconditional reinstatement, respondent never receded materially from its prior position, but reasserted through its attorney at a conference on November 6th that "the men would be rehired if their job had not been filled," but that "if they returned, they would be returned as new employees". Though respondent concededly did not maintain a seniority system, as such, the effect of its position that all the striking employees had actually terminated their employment through violation of the previously mentioned plant rule,[5] and particularly its consistent treatment of a number of strikers actually rehired "as new employees", was that Christmas bonuses and vacation time of these employees, which would have accrued in their favor but for the strike, were substantially restricted by respondent's failure to credit them with their period of employment preceding the strike. On November 8th, the union ended the strike and removed the picket line.

The Board originally adopted those findings of the Trial Examiner here material to the effect that respondent's employees, by engaging in the walkout on October 16, 1951, were economic strikers entitled to reinstatement with back pay from the time of their unconditional application through union representative, Lee, as of 3:30 P.M. that same day; that respondent, in refusing to take them back before any permanent replacements had been hired, except "as new employees" with restricted bonus and vacation benefits, had in effect discriminatorily discharged and refused to reinstate them because of its plant rule, in violation of Sections 8(a)(3) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 3).[6] In a supplemental decision and order denying respondent's motion for reconsideration, a majority of the Board conceded that "at least some of the strikers engaged in unprotected activity", and expressly acknowledged "the validity of the general principle" that employees who deliberately time a strike so as to create a risk of substantial property damage thereby "engage in unprotected activity for which they may be discharged or

---

4. There is further testimony to the effect that, at 3:30 P.M. that same afternoon, union representative Lee again telephoned manager Fry, and unconditionally applied for reinstatement of the strikers; that Fry then restated respondent's prior position to the effect that the men should apply to the foreman, and if they were hired, "they would be employed as new employees"; and that he made no mention of the risk of property damage created by the strike.

5. The Board argues that respondent's indiscriminate treatment of *all striking employees* as having quit through violation of the rule barring absence without permission in any event was unjustified, since the group affected included not only

those employees who walked out at 11 A.M. and created a risk of property damage, but all other strike participants without regard to when they joined the strike and whether their walking out actually contributed in any degree to the property hazard.

6. The Trial Examiner also found, with tacit Board approval, that the eleven employees terminated by respondent prior to the strike had been discharged for justifiable cause under the Act, and that respondent further had not violated its 8 (a) (5) obligation to bargain with the union in good faith. These findings that the strike did not result from any unfair labor practices by respondent are not in dispute here.

subjected to other forms of discipline affecting their employment conditions". The majority concluded, however, with Chairman Guy Farmer dissenting, that this principle had no application so as to bar reinstatement of any of the striking employees here. Relying upon well settled principles that "a striker does not automatically lose his status as an employee under the Act", and that "an employer may waive his right to discharge or discipline an employee for engaging in such conduct" in such manner that he "may not later assert the misconduct as a valid reason for discharge or refusal to reinstate", the majority observed that the crucial issue was "whether the Respondent did *in fact* condone or waive the strikers' misconduct." They viewed the record as disclosing "clear and convincing evidence of such condonation", unlike the dissenting Chairman, who could find "no real evidence of condonation in this case."

We think the majority of the Board had no authority to compel reinstatement of those employees who either participated in, authorized or ratified the illegal walkout of October 16, 1951. That the union deliberately timed its strike without prior warning and with the purpose of causing maximum plant damage and financial loss to respondent cannot be denied.[7] Even conceding the validity of the general principle relied upon, i. e. that employees who engage in certain unprotected activities do not automatically lose their employee status for remedial purposes under the Act,[8] it seems to us that the illegitimate nature of this activity, though taking the form of a concerted walkout rather than a sit-down strike, renders it closely akin to that type of irresponsible and unprotected activity condemned by the Supreme Court as effectively removing the guilty employees from statutory protection. See N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 255–259, 59 S.Ct. 490, 83 L.Ed. 627; Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 38, 62 S.Ct. 886, 86 L.Ed. 1246; McNeely & Price Co. v. N. L.R.B., 3 Cir., 106 F.2d 878, 880; N.L.R.B. v. Ohio Calcium Co., 6 Cir., 133 F. 2d 721, 726–727; Mid-Continent Petroleum Corp. v. N.L.R.B., No. 134, 54 N.L. R.B. pp. 912, 931–933.

Assuming, however, that the majority espoused doctrine of condonation is properly applicable to vitiate the unlawful character of this strike, we agree with the dissenting Chairman that there is no substantial evidence to sup-

---

7. Though respondent has filed no separate appendix incorporating those portions of the testimony upon which it principally relies, there is undisputed testimony by the President of the local union, R. C. Lisman, and the union representative, J. A. Lee, paraphrased in the dissenting opinion of the Board Chairman as follows:

"11 o'clock in morning is the time 'when they were pouring off the wheels and taking them out'; that is 'about the time when the crucible that carried the molten metal is about the hottest'; if they don't pour the molten metal off at 11 o'clock 'it will come off the cupola and run off down the sides the railroad tracks' and 'run everybody out of there'; if there are wooden legs under the crucible, it would burn them, if they didn't take the molten metal out of the crucible."

"We decided 11 o'clock would be the most effective time to come out; that would be time when operation of plant would be at its highest peak of activity;

I knew that at that time the cupola had been fully charged and would be full of molten metal that would have to be poured off, requiring some 'hasty labor', unless it were dumped; and, if all employees had walked out, there would not be any labor to take care of it * * *. It was the crippling time for all the employees to come out. Unless the molten metal could be poured off quickly at 11 o'clock, I knew that it possibly would be a severe blow to the company financially and 'otherwise'."

8. For instances involving application of this general rule to divergent factual situations, consider e. g., N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477, 484; N. L. R. B. v. E. A. Laboratories, Inc., 2 Cir., 188 F.2d 885; Hazel-Atlas Glass Co. v. N. L. R. B., 4 Cir., 127 F.2d 109, 118; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 885–886, 888; Stewart Die Casting Corp. v. N. L. R. B., 7 Cir., 114 F.2d 849, 855–856.

port a finding of employer condonation here. Where, as here, the strike misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred. We think respondent correctly asserts that the essential elements of condonation, i.e. forgiveness and the resumption of the former relationship between the strikers and respondent, are patently lacking here. As the Board Chairman observed, respondent never affirmatively indicated its forgiveness for the strikers' misconduct, nor did it ever actually consent to re-employ them without penalty, but at the union's insistence agreed to take them back only "as new employees". See N.L.R.B. v. Dorsey Trailers, Inc., 5 Cir., 179 F.2d 589, 592; N.L.R.B. v. Warner Bros. Pictures, Inc.,

9 Cir., 191 F.2d 217, 219; cf. W. T. Rawleigh Co. v. N.L.R.B., 7 Cir., 190 F.2d 832, 837; Longview Furniture Company, 100 N.L.R.B. 301, 306; Alabama Marble Company, 83 N.L.R.B. 1047, enforced per curiam, 5 Cir., 185 F.2d 1022; Hoover Co. v. N.L.R.B., 6 Cir., 191 F.2d 380.

The majority of the Board, however, relying mainly upon the Board's finding of employer condonation in its Clearfield Cheese Company case, 106 N.L.R.B. No. 80, nevertheless found that respondent had, in effect, affirmatively indicated its intent to condone the strikers' misconduct, thereby waiving its right to discharge or deny them reinstatement therefor, both by Fry's failure during the emergency situation created by their walkout expressly to assign their unprotected activity as the reason for their discharge, and by the failure of respondent's attorney either in the pleadings [9] or at the hearing before the Trial Examiner [10] unequivocally to assert their

9. In finding condonation, the Board majority noted respondent's failure in its answer to the complaint specifically to allege that its treatment of the strikers "as new employees" was motivated by their misconduct. Paragraph 16 of respondent's answer, however, does state:

"With respect to paragraph 16 of the complaint, respondent would show that approximately 45% of its employees walked off the job without notice at 11:00 o'clock A.M. on October 16, 1951, and at a time when it was most crucial in the daily operation of the plant, and had the walkout been 100% insofar as the employees were concerned respondent would have lost equipment in a sum in excess of $75,000.00 and the plant would have been out of operation for a period of several months due to the fact that the employees who walked off walked off at a time when the vessels of respondent were full of molten metal which had to be poured off quickly and in an orderly manner in order to save not only the molten metal for manufacturing the products of respondent but in order to save the vessels themselves."

The majority further relied upon respondent's failure, in its motion for reconsideration, to defend affirmatively on the ground that the 11 A.M. walkout created such a risk of property damage as justified discharge of the guilty employees. However, we think respondent

did assert this defense in its motion in the following language:

"Considering the circumstances, the Respondent had a right to discharge the men who engaged in a strike deliberately timed so as to destroy its machinery and equipment, particularly since such action amounted to a crime under Texas law. As a necessary concomitant of this right, it had the right to insist that the men who engaged in such attempted violence should return as 'new employees'. However, the Respondent did not discharge the strikers, but offered to return all of those who had not been replaced, and merely requested that they go to their foremen to ascertain whether or not they had been permanently replaced. Further, the General Counsel did not prove that the Christmas Bonuses and/or vacation pay were in any way connected with seniority, and in fact it was proved that the Respondent had no seniority system at all."

10. The majority quoted a pertinent excerpt from the colloquy at the hearing as follows:

"Trial Examiner * * * as I understand the pleadings, no employee was discharged or refused reinstatement because of this potential serious situation in the plant.

"Mr. Gooch (representing the Respondent): That's right. * * * * *

justifiable discharge for strike misconduct as an affirmative defense to reinstatement. The Board's order in the Clearfield Cheese Company case, supra, insofar as based upon the finding of condonation arising from substantially similar facts, was subsequently denied enforcement by the Third Circuit in language as follows:

"The Board's thought is that respondent condoned the misconduct (1) by failing to mention it at any time during the otherwise lawful strike as a reason for not taking back its employees; and (2) in indicating that it would 'reinstate' the strikers to available positions irrespective of their behavior.

"Reinstatement was never offered by respondent. Orally and in writing it emphasized that any hiring would be solely on a new employee status. The misconduct by the strikers, as the Examiner states, was that they ' * * * physically barred all entrances to the plant in such a manner that for the non-strikers there was "an effective implied threat of bodily harm * * * should they risk entering the plant". Socony Vacuum Oil Company, Inc., 78 N.L.R.B. 1185, 1186.' That action was directly opposed to the

force and violence prohibition of the Act. It was for that reason the reinstatement rights of the strikers in question were forfeited. N.L.R.B. v. Fansteel [Metallurgical] Corporation, 306 U.S. 240, 258, 59 S.Ct. 490, 83 L.Ed. 627; McNeely & Price Co. v. N.L.R.B., 3 Cir., 1939, 106 F.2d 878, 880. Where the employer sees fit to waive its rights to terminate because of misconduct the employment of particular employees it can hardly be assumed to have foreclosed itself from rejecting any other employees in the same category. What the Supreme Court said in Fansteel, supra, 306 U.S. at page 259, 59 S.Ct. at page 497, applies to the situation before us:

" 'The important point is that respondent stood absolved by the conduct of those engaged in the "sit-down" from any duty to reemploy them, but respondent was nevertheless free to consider the exigencies of its business and to offer reemployment if it chose. In so doing it was simply exercising its normal right to select its employees.' " N.L.R.B. v. Clearfield Cheese Co., 213 F.2d 70, 75.

We think the failure of respondent unequivocally to assert its valid

"Trial Examiner: But these men were not penalized or discharged, so where is the issue?
"Mr. Gooch: I don't think we have a case, but that is what we are trying down here."
However, the respondent quotes further portions of that same colloquy substantially revealing respondent's attempt to assert inconsistent defenses alternatively as follows:
"Mr. Gooch: My point is this, In answer—the Board has some inconsistent pleadings in this complaint which calls for—
"Trial Examiner Ruckel: So you have to have some inconsistent answers.
"Mr. Gooch: So I have to have some inconsistent answers. Now, in justification of making these men, if they wish to return come back as new employees, I have to plead as indicated.
"Trial Examiner Ruckel: Well, it amounts to this, that you state. I be-

lieve, or contend that those who came back after the strike and asked for their jobs were given jobs if the jobs still existed?
"Mr. Gooch: That's right.
"Trial Examiner Ruckel: And without any discrimination as to the terms of their employment, that is, so far as vacation or other rights and privileges were concerned; but if they were not, then that was justified because of the nature of the walkout which exposed the plant to serious harm.
"Trial Examiner Ruckel: So it comes to this. If the Board should find that these men came back only as new employees which resulted in loss of Christmas bonus or diminution of it, and the loss of vacation pay, if that was so, which you deny, then it was justified because of their walkout under these particular circumstances.
"Mr. Gooch: That's right."

defense of strike misconduct in its pleadings, and the statements of respondent's attorney at the hearing construed as admissions by a majority of the Board, may not fairly be accorded the effect claimed. To the contrary, it seems to us that respondent, in denying in its answer and motion for reconsideration that it had discharged the strikers, but alleging that their discharge would have been justified, was merely pleading separate and alternative, though inconsistent, defenses. Furthermore, viewing the contentions of respondent's counsel as contained in the disputed colloquy with the Trial Examiner fully and fairly in their entirety, rather than on the basis of the excerpt quoted by the majority, it seems to us that, like the pleadings, they sufficiently reveal that the risk of danger to respondent's plant resulting from the concerted walkout was alternatively pleaded in justification for any discharge or discipline of the strikers, resulting from their reinstatement only "as new employees", which might be found by the Board. While respondent's position throughout might have been more aptly and unequivocally stated, it is nevertheless true that the issue of whether a Board order of reinstatement should be enforced in any case properly depends upon the substantiality of the evidence " 'on the record considered as a whole' ", Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 463, 95 L.Ed. 456, and upon considerations of whether any legitimate *remedial* purpose of the Act would be subserved thereby, rather than upon the aptness of phraseology used by the parties in any instance.[11] The Board itself has many times successfully urged upon the courts its theory that harsh requirements of common law pleading are inapplicable to restrict its proceedings, thereby displaying a commendable administrative reluctance to permit subordination of the statutory substance to technicalities of legal form. See Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229–230, 59 S.Ct. 206, 83 L.Ed. 126; Annotation 123 A.L.R. 628.

Of course, the majority acknowledged a correct general principle in holding that respondent's plant rule barring absence without permission could not be discriminatorily applied or enforced so as to terminate an employee's status for engaging in a lawful strike, thereby abrogating the statutory right of employees to engage in concerted activity. See N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381; J. A. Bentley Lumber Co. v. N.L.R.B., 5 Cir., 180 F.2d 641, 642; N.L.R.B. v. United States Cold Storage Corp., 5 Cir., 203 F.2d 924, 926. We think they erred, however, in concluding that respondent treated the guilty employees "as applicants for new employment *solely* because of their violation of the plant rule", and was not primarily concerned with the imminent threat of damage resulting from the precipitate walkout. Their ultimate conclusion that "it was the violation of the plant rule, and that alone, which respondent refused to condone or forgive" seems to us illogically to confuse cause and effect, to make the tail wag the dog. Assuredly the respondent was not more interested in preserving the inviolability of its plant rule, as such, than it was in protecting its plant from the extensive damage and loss which might have resulted from the illegal walkout. On the ultimate issue of whether respondent was entitled to discharge or

11. Insofar as the majority's finding of condonation purports to be based upon Fry's failure effectively to discharge them *in precise terms* for their misconduct during the emergency situation which it precipitated, we think this Court's recent pronouncement in N. L. R. B. v. National Paper Co., 5 Cir., 216 F.2d 859, 866, is appropriate for restatement here:

"We think the Trial Examiner's and Board's reasoning in this regard is fairly subject to the criticism that an employer's exercise of business judgment in an admittedly tense situation ought not be so narrowly scrutinized, weighed in delicate balance and subjected to such strict hindsight review as to the necessity of specific action taken on the basis of 'ex post facto criticism' from persons not actually confronted with the emergency."

deny reinstatement to the offending strikers, the real inquiry is the character of the concerted activity engaged in, not whether the rule was incidentally breached thereby. If there actually exists any conflict in this case between the enforcement of respondent's plant rule and the statutory right of its employees to engage in legitimate concerted activity, we certainly find no inconsistency in its application here as to those particular employees who participated in, authorized or ratified the strike misconduct.

■ Finally, while the dissenting Chairman apparently subscribed to the view that *all* the striking employees were properly discharged, irrespective of whether they actually engaged in the unlawful walkout, we note that the majority found it "unnecessary to determine which, if any, of the strikers engaged in unprotected activity" to such an extent as would forfeit their right, as economic strikers, to reinstatement before their jobs had been filled. On this issue, the Board contends in brief that, if the dereliction of individual strikers was improperly treated "as irrelevant in the circumstances of this case, it will be necessary to remand the case to the Board to identify which of the strikers actually engaged in misconduct," in view of the principle that only those employees guilty of strike misconduct may justifiably be discharged or disciplined for their default. See N.L.R.B. v. Crowley's Milk Co., 3 Cir., 208 F.2d 444, 446; N.L.R.B. v. Deena Artware, Inc., 6 Cir., 198 F.2d 645, 652; N.L.R.B. v. Wallick, 3 Cir., 198 F.2d 477, 485, note 10; N.L.R.B. v. Mt. Clemens Pottery Co., 6 Cir., 147 F.2d 262, 268; N.L.R.B. v. Ohio Calcium Co., 6 Cir., 133 F.2d 721, 726; Republic Steel Corp. v. N.L.R.B., 3 Cir., 107 F.2d 472, 479. To the contrary, respondent contends, in effect, that the issue of misconduct by individual employees is immaterial, and that it properly discharged or denied reinstatement to all strikers, regardless of when they joined the strike and whether their cessation of work actually contributed to the property hazard,[12] presumably on the theory of an agency relationship between all strikers, the guilty employees, and the union. Though this precise question was not considered by the Board, and has never been adequately argued or briefed, it seems to us that the following language of the 6th Circuit, in a case arising under the Act before amendment, N.L.R.B. v. Ohio Calcium Co., 133 F.2d 721, 726, is applicable and appropriate for restatement here:

"Respondent insists that none of its striking employees are entitled to reinstatement, because all were members of the Union which initiated and conducted the unlawful strike and further that each was a

12. The Board argues in brief that, in any event, respondent was not justified in discharging or denying reinstatement to those striking employees whose work shift was either completed before the 11 A.M. walkout, or did not begin until afterwards, since their act of striking could not have contributed to the property hazard because they then owed respondent no duty of care; that respondent was further unjustified in denying reinstatement to a janitor, whose cessation of work obviously could not have contributed to the threat of property damage; finally, that respondent could not justifiably deny reinstatement for strike misconduct to the employee, Sam Hall, who, according to his undisputed testimony, did not honor the 11 A.M. walkout, but remained at work until 6 days after the strike had begun.

Under the present record, and in the absence of any specific Board finding thereon, we expressly pretermit any holding as to whether all of these strikers forfeited their right of reinstatement through the unlawful activity of the guilty employees, though we think that the Board upon remand should bear in mind that the group lawfully discharged or denied reinstatement except as "new employees" should appropriately include not only all striking employees who, without prior warning, shirked their direct responsibility for pouring off the molten metal or taking any other necessary safety precautions, but also those employees whose duties actually entailed no direct responsibility therefor, if they in any manner aided or abetted the unlawful activity.

member of a combination or conspiracy to engage in lawful conduct. This contention must fail. Members of a Union participating in a labor dispute are not responsible 'for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.' Sec. 6 of the Norris-LaGuardia Act, 29 U.S.C.A. § 106.

"The implied termination of an employer-employee relationship, by reason of unlawful conduct in labor controversies applies only to those actually participating in violence and their aiders and abettors. National Labor Relations Board v. Fansteel [Metallurgical Corporation], supra (op., 306 U.S. [240] 269, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.)"

■ This record does not satisfactorily reveal sufficient facts to enable us to pass intelligently upon the issue of whether *all* striking employees must necessarily be denied reinstatement in the light of the cited authorities. In any event, it is the Board's initial province under the Act, indeed its duty, to find the essential facts upon which an order granting or denying reinstatement may legitimately be based. And in the absence of specific findings by the Board upon this issue, we are unable to accept respondent's intimation in brief that, unless reinstatement is denied as a matter of law to all striking employees because of the dereliction of their union officers and other strikers, an abortive construction of the act will result which would permit individual strikers to profit from misconduct by union officers or other union members merely because they did not actually participate

therein. It seems to us that this contention disregards the repeated admonition of this Court, as recently and so aptly stated by Chief Judge Hutcheson in N.L.R.B. v. Braswell Motor Freight Lines, 209 F.2d 622, 624, that we ought *not summarily "by our decree, entered to protect the employees, too often the forgotten men in struggles of this kind, deprive them of the rights the act confers not on unions as such but on employees as such."* (Emphasis supplied.)

■ In view of the majority's conceded failure to resolve what appears to us the crucial factual issue in this case, and its erroneous treatment of the striker's conduct as immaterial because of respondent's claimed concessions and condonation, we think that this case must be remanded to the Board with directions to ascertain which employees were justifiably discharged or denied reinstatement for the strike misconduct in the light of the aforementioned principles. We have dealt with this issue at some length, principally because it appears to us that, in this type situation, the Board has the initial duty and responsibility, in the exercise of its broad statutory discretion, to fashion an order which, while deterring irresponsible dereliction of duty either by unions or individual members thereof by refusing them all remedial relief, nevertheless would not tend to penalize those individual employees, if any, who may not fairly be charged with any responsibility therefor.

Enforcement of the Board's order is denied without prejudice to further proceedings consistent with the views expressed in this opinion,[13] and the cause is remanded to the Board for the purposes and action herein indicated.

Denied and remanded.

13. See N. L. R. B. v. Kingston Cake Co., 3 Cir., 191 F.2d 563, 568; N. L. R. B. v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65, 66, 68; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F. 2d 576, 584; N. L. R. B. v. Kelco Corp., 4 Cir., 178 F.2d 578, 582; N. L. R. B. v. Mid-Co Gasoline Co., 5 Cir., 172 F.2d 974.