**NEWSPAPER PRODUCTION COMPANY, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**SHREVEPORT ENGRAVING COMPANY, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

Nos. 73-3093, 73-3094.

United States Court of Appeals, Fifth Circuit.

Nov. 6, 1974.

824

Andrew C. Partee, Jr., New Orleans, La., for petitioners.

Elliott Moore, Deputy Associate Gen. Counsel, Jay E. Shanklin, Atty., N.L.R.B., Washington, D. C., Charles M. Paschal, Jr., Regional Director, Region 15, N.L.R.B., New Orleans, La., for respondent.

John S. McLellan, Jr., D. Bruce Shine, Kingsport, Tenn., for intervenor Shreveport Printing Pressmen's Local Union No. 181.

Before MOORE,* AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

These cases are before this Court upon the petitions of Newspaper Production Company (NPC) and Shreveport Engraving Company, Inc. (Engraving) pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), to review and set aside an order of the National Labor Relations Board issued on August 27, 1973, in a consolidated proceeding against them. The Board has cross-applied for enforcement of its order which is reported at 205 NLRB No. 113 (1973).

In this case, we push the law concerning the ability of a union to bargain to impasse slightly ahead of where we found it, but the remainder of the issues are controlled by the application of settled law to the facts. Contrary to the arguments of NPC and Engraving, we uphold the Board's determination (1) that the two constituted a single employer for purposes of collective bargaining, (2) that a striking union was entitled under the circumstances here to insist on bargaining to the point of impasse for a larger appropriate bargaining unit, (3) that the Companies violated sections 8(a)(3) and (1) of the Act, 29 U.S.C.A. § 158(a)(3) and (1), by failing to reinstate the strikers after they unconditionally offered to work and by discharging the NPC strikers. We therefore deny the petitions for review and enforce the order on the Board's application.

The conflict which led to the serious repercussions of this case started innocently enough when the general production workers of Engraving, three in number, chose Local 214 of the Lithographers and Photoengravers International Union (the Union) as their bargaining representative. The same Union had previously represented the eight to eleven skilled photoengravers which comprised the other significant group of Engraving's employees. The photoengravers' contract had expired and was

* Hon. Leonard P. Moore, Senior Circuit Judge of the Second Circuit sitting by designation.

up for renewal at the same time the Union was negotiating on behalf of the newly represented general production employees. The Union took the position that the photoengravers and the general production workers should be included in one bargaining unit and should be the subject of one contract. The Union secretary asserted that since there were so few general production workers he did not want to bother with two contracts. Engraving resisted, apparently on the ground that it did not want skilled and unskilled workers in the same contract. For reasons that do not appear in the record and that we are unable to discern from written and oral argument, positions hardened to the point of total disagreement, and the Union struck.

Up to this point only Engraving and its workers were involved. Upon striking, however, the Union threw a picket line around the building which, in addition to Engraving, also housed the offices and plant of NPC, the other petitioner in this proceeding. At the same time the Union successfully urged certain NPC employees, members of the International Stereotypers and Electrotypers Union Local No. 132 (Stereotypers) and Shreveport Printing Pressmen's Local Union No. 181 (Pressmen), to refuse to cross the picket line. The picket line was dropped a few days later when it was learned that members of still another union had entered the building despite the picketing. Thereupon a Union official informed Engraving's manager that its employees were ready to return to work and resume negotiations, and the NPC employees who had honored the picket line showed up en masse at the building to reclaim their jobs. When NPC and Engraving did not reinstate these employees, members of all three unions resumed picketing, claiming a lockout. NPC discharged the Pressmen and Stereotypers for violating alleged no-strike clauses in their contracts.

These facts raise the issue of whether or not the employees of Engraving were entitled to bargain to impasse, i. e., to bring strike pressure on the Company when it failed to agree to treat the two groups of employees as a single unit.

The single employer issue is raised by the following facts: Times Publishing Company, Ltd. and the Journal Publishing Company, Inc., separately owned, publish two daily newspapers in Shreveport, Louisiana, out of the same plant. While the editorial and reporting operations of each are separate, NPC handles the mechanics of publication of both newspapers, including sales of subscriptions and advertising, circulation and printing. NPC is a joint venture of both newspapers, being owned $62\frac{1}{2}$ percent by the Times, and $37\frac{1}{2}$ percent by the Journal. NPC obtains its photoengraving work for both newspapers from Engraving which is owned equally by the Times, the Journal, and an unrelated third party. This sets the backdrop for the claim that NPC and Engraving are a single employer for collective bargaining purposes. Additional facts will be developed as we explore each contention of the parties in this proceeding.

After an extensive hearing, the Administrative Law Judge recommended dismissal of the complaint filed by the unions against Engraving and NPC. He ruled that the Union had violated section 8(b)(3) of the Act by insisting to the point of impasse on expansion of the bargaining unit, a nonmandatory subject of collective bargaining. Then, deciding that the two concerns were separate employers for collective bargaining purposes, he ruled that the photoengravers' Union had violated section 8(b)(4) of the Act by inducing an illegal secondary boycott of NPC. Since the strike was not protected concerted activity, the Companies, in his view, committed no violation of the Act by refusing to reinstate the employees despite their unconditional requests for reinstatement.

The Board did not accept all of the Administrative Law Judge's conclusions. Contrary to his findings, it found that, under the circumstances of this case, the Union members were entitled to strike

to bring pressure on Engraving to accept an expanded bargaining unit and that the two businesses did constitute a single employer for bargaining purposes. It also ruled that the Stereotypers and Pressmen, sympathy strikers honoring the Union's picket line, had not violated valid no-strike clauses, because there were, in fact, no such clauses in their contracts. It affirmed the finding that the strikers' requests for reinstatement were unconditional. It held that NPC and Engraving violated section 8(a)(3), and derivatively section 8(a)(1), in discharging or failing to reinstate employees engaged in protected concerted activity. The Board sustained the Law Judge's holding that Engraving had not violated its section 8(a)(5) obligation to bargain in good faith by insisting to impasse on separate contracts for the two units.

Accordingly, the Board issued a cease and desist and reinstatement order, requiring the Companies to offer the affected employees immediate reinstatement with backpay, discharging if necessary any replacement employees hired after August 22, 1969, (the date the strikers unconditionally applied for reinstatement). If the number of employees desiring reinstatement exceeds the number of available positions, the Companies are to place the remaining strikers on a preferential hiring list qualifying them for reinstatement and backpay as vacancies occur.

The Companies attack the Board's order on four grounds. They allege that (1) the Board's finding Engraving and NPC a single employer is not supported by substantial evidence, (2) the Board erred in holding the bargaining unit to be a mandatory issue on which the Union could insist to the point of impasse, (3) the Board's finding of employee unconditional requests for reinstatement is not supported by substantial evidence, and (4) the Board wrongfully interpreted the Stereotypers' and Pressmen's contracts as not including no-strike obligations.

## I. SINGLE EMPLOYER ISSUE

■ The Companies first challenge the Board's conclusion, contrary to that of the Administrative Law Judge, that Engraving and NPC were a single employer for collective bargaining purposes. A successful challenge would require us to deny enforcement of the Board's order, since if the Companies were separate employers, their employees violated section 8(b)(4) of the Act—the members of the photoengravers' Union by inducing, and the NPC employees by participating in an unlawful secondary boycott. If the employees violated the Act, they cannot invoke its protection and are not entitled to reinstatement upon request. NLRB v. Marshall Car Wheel & Foundry Co., 218 F. 2d 409 (5th Cir. 1955); National Packing Co. v. NLRB, 352 F.2d 482 (10th Cir. 1965), appeal after remand, 377 F. 2d 800 (1967); NLRB v. Blades Manufacturing Corp., 344 F.2d 998 (8th Cir. 1965); United Furniture Workers v. NLRB, 118 U.S.App.D.C. 350, 336 F.2d 738, cert. denied, 379 U.S. 838, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964); see Southern Steamship Co. v. NLRB, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942). On the other hand, if substantial evidence supports the Board's single employer finding, both groups of employees which engaged in the economic strike are entitled to reinstatement on request, subject to the rights of previously hired permanent replacements.

■ The central theme of the secondary boycott provisions of the National Labor Relations Act is protection of neutral employers from union pressures designed to involve them in labor disputes not their own. National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 625–626, 87 S.Ct. 1250, 18 L. Ed.2d 357 (1967); see NLRB v. Local 825, Operating Engineers, 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). The Supreme Court has recognized the Board's use of four factors to determine if nominally separate business entities

make up a single integrated enterprise and hence are not neutral in each other's labor disputes. "The controlling criteria . . . are interrelation of operations, common management, centralized control of labor relations and common ownership." Radio Technicians Local 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L. Ed.2d 789 (1965). Ultimately, however, the inquiry into neutrality involves a case by case consideration of the factual relationship between the secondary employer (here NPC) and the primary employer (here Engraving) against the legislative purpose to protect only employers "wholly unconcerned" with the primary labor dispute. Vulcan Materials Co. v. United Steelworkers, 430 F.2d 446 (5th Cir. 1970), cert. denied, 401 U. S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); NLRB v. Local 810, Steel Fabricators, 460 F.2d 1 (2d Cir.), cert. denied, 409 U.S. 1041, 93 S.Ct. 527, 34 L. Ed.2d 491 (1972).

■ The record in this case adequately supports the Board's conclusion that the two companies were properly to be considered as a single enterprise for collective bargaining purposes. NPC is owned jointly by Times Publishing Co. (62½%) and Journal Publishing Co. (37½%), the two daily newspapers in Shreveport, Louisiana. The two papers also each own a one-third interest in Engraving, with the remaining interest held by an independent third party. The President of the Times, William H. Bronson, Sr., is both NPC's President and Engraving's Chairman of the Board.

Both Engraving and NPC conduct their operations in the basement of the building housing the editorial and other staffs of both newspapers. Engraving supplies virtually all of NPC's photoengraving needs, devoting 50 percent of its efforts to NPC work. Because of volume discounts, NPC work accounts for only 30 percent of Engraving's gross sales. A significant portion of Engraving's other revenue is derived from work done for firms advertising in the papers. For these clients, Engraving picks up copy at the advertiser's place of business, engraves the material on plates, and delivers the finished product directly to the NPC composition room. As a final indicator of the interrelated nature of the Companies' operations, we note the attendance of Charles Nicholson, Engraving's manager, at NPC's daily quality control meetings for department supervisors.

Although Nicholson had complete charge of Engraving's day-to-day operations after his appointment as manager by Bronson, Sr., NPC had a continuing involvement in Engraving's labor relations. Bronson Sr. told Nicholson not to negotiate labor contracts by himself and suggested he consult NPC's Director of Labor Relations, William H. Bronson, Jr., a person trained in labor relations. Bronson Jr. subsequently participated in Engraving's contract negotiations, including those leading to the dispute now before us. In addition, Douglas Attaway, Jr., a Journal vice-president who regularly sat in on NPC labor negotiations, joined Engraving's negotiating team after the photoengravers went on strike.

■ Although a case might be made to support the Administrative Law Judge's finding of the Companies' status as separate enterprises, it is apparent from the foregoing summary of the evidence that the Board's determination that NPC was not neutral and disinterested in Engraving's labor dispute is also tenable. In such a case, we must affirm the Board's determination. Under the substantial evidence test mandated by 29 U.S.C.A. § 160(e), as a reviewing court, we may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," even if the determination involves application of law to facts rather than pure factfinding. NLRB v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 992, 19 L.Ed.2d 1083 (1968); *see* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456

(1951). Accordingly, we uphold the Board's determination on the single employer issue.

## II. BARGAINING TO IMPASSE ON THE BARGAINING UNIT

■ The Companies next contend that the Board erred in reversing the Administrative Law Judge and holding that the photoengravers' Union was entitled to insist to the point of impasse and strike upon expansion of the contractual bargaining unit to include the general production workers. The result of this holding is that the strike was not considered violative of section 8(b)(3) as embracing an unlawful objective. The Companies urge that a proposed change in the bargaining unit is not a mandatory subject of bargaining and that the Union members lost the protection of the Act by striking to enlarge the unit. If the Companies' view is correct, those NPC workers who refused to cross the Union's picket line also lost the protection of the Act because sympathy strikers stand in the same shoes as the striker with whom they sympathize. NLRB v. Southern Greyhound Lines, 426 F.2d 1299, 1301 (5th Cir. 1970); *see* Virginia Stage Lines, Inc. v. NLRB, 441 F.2d 499 (4th Cir.), cert. denied, 404 U.S. 856, 92 S.Ct. 105, 30 L.Ed.2d 98 (1971). Since neither Company's employees were engaged in protected activities, neither Company was required to reinstate its workers upon their request. NLRB v. Marshall Car Wheel & Foundry Co., 218 F.2d 409 (5th Cir. 1955); National Packing Co. v. NLRB, 352 F.2d 482 (10th Cir. 1965), appeal after remand, 377 F.2d 800 (1967). On the other hand, if the photoengravers were engaged in a lawful strike over expansion of the bargaining unit, both Companies committed an unfair labor practice in not reinstating their employees upon unconditional request.

■ Generally, insistence to the point of impasse on restriction or expansion of the bargaining unit is an unfair labor practice. *See, e. g.,* Hess Oil & Chemical Corp. v. NLRB, 415 F.2d 440 (5th Cir. 1969), cert. denied, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970); NLRB v. IBEW, 266 F.2d 349 (5th Cir. 1959); International Longshoremen's Ass'n v. NLRB, 107 U.S.App.D.C. 329, 277 F.2d 681 (1960); Douds v. International Longshoremen's Ass'n, 241 F.2d 278 (2d Cir. 1957). The considerations prompting this general rule are, however, largely absent in this case. We therefore decline to extend the rule to cover the particular facts before us in the face of a contrary conclusion by the Board, the agency charged with the responsibility of setting our national labor relations policy. In so doing we do not in any manner impugn the general rule in the contexts in which it has previously been applied.

Here the Union already represented the general production workers they sought to include in the bargaining unit. Thus, unlike other court decisions, this case does not involve any interference with the representational rights of the employees affected by expansion of the unit. *See, e. g.,* Sperry Systems Management Div. v. NLRB, 492 F.2d 63 (2d Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3065 (U.S., Aug. 13, 1974), (No. 73–1712); International Longshoremen's Ass'n v. NLRB, 107 U.S.App.D.C. 329, 277 F.2d 681 (1960). Nor does it present a jurisdictional dispute between two unions. *See, e. g.,* NLRB v. IBEW, 266 F.2d 349 (5th Cir. 1959); Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir. 1969).

The Companies concede that the proposed bargaining unit, comprising both photoengravers and general production workers, would be an appropriate unit under established Board principles. The Board relied on a clause in the expiring contract providing for inclusion in the contract of any unaffiliated department that subsequently chose the photoengravers' Union as its bargaining representative, as an indication that the parties regarded the scope of the bargaining unit as an issue suitable for resolution through bargaining.

In contrast to other decisions, this case does not involve a demand for a unit that would conflict with a previous Board unit certification. *See, e. g.,* Sperry Systems Management Div. v. NLRB, 492 F.2d 63 (2d Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3065 (U.S., Aug. 13, 1974) (No. 73–1712); NLRB v. Southland Cork Co., 342 F.2d 702 (4th Cir. 1965). The mere absence of Board certification does not, however, preclude an unfair labor practice finding. *See* Hess Oil & Chemical Corp. v. NLRB, 415 F.2d 440 (5th Cir. 1969), cert. denied, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970). In *Hess,* the respondent company was held to have violated the Act by insisting to impasse on the exclusion of certain workers from an appropriate bargaining unit previously agreed upon by contract. The Court indicated that it was an unfair labor practice to insist on a change from an appropriate bargaining unit to an inappropriate one. *Id.* at 444. *See also* Boire v. Teamsters, 479 F.2d 778, 801 (5th Cir. 1973). In seeking an appropriate unit, the Union did not infringe upon the Board's function of formulating national labor relations policy, particularly in view of the parties' previous agreement concerning the scope of the bargaining unit. Since this case is not one appropriate for application of the doctrine that insistence on a change in the bargaining unit is a violation of the Act, we uphold the Board's finding that the Companies committed unfair labor practices in refusing to reinstate the employees who struck in support of the enlarged bargaining unit.

### III. UNCONDITIONAL REQUESTS FOR REINSTATEMENT

The Companies, conceding for argument's sake that their employees were engaged in a protected concerted activity, challenge the Board's finding that the strikers made unconditional requests for reinstatement. Engraving argues that the photoengravers conditioned their return on NPC's reinstatement of the sympathy strikers. There is ample evidence to support the conclusion that this alleged condition was one placed on a final collective bargaining agreement rather than on the employees return to work. NPC contends its employees also insisted on returning to work as a group. The Unions, however, at various times requested information as to the number and type of replacements hired, indicating an awareness that reinstatement depended on the availability of jobs. The Companies, in turn, demanded that the strikers make individual requests for reinstatement. An employer is not permitted to delay reinstatement by insisting on such a procedure. A collective request for reinstatement made through the Union is sufficient. Retail Union v. NLRB, 151 U.S.App.D.C. 209, 466 F.2d 380 (1972); *see* Olin Industries, Inc. v. NLRB, 191 F.2d 613 (5th Cir. 1951), cert. denied, 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952); Serv-Air, Inc. v. NLRB, 395 F.2d 557 (10th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968). Once such a request is made, the burden is on the employer to offer reinstatement to employees for whom positions are available. *See* NLRB v. Transport Co., 438 F.2d 258 (5th Cir. 1971); American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970). That the mass application at the plant door occurred at a time other than the beginning of a shift does not satisfy the employer's burden under *American Machinery* to demonstrate "legitimate and substantial business justification for denying reinstatement."

It is clear from the record that neither Engraving nor NPC had eliminated or had filled with permanent replacements all positions vacated by the strikers. Engraving violated sections 8(a)(3) and 8(a)(1) by refusing their employees' unconditional request for reinstatement. Backpay to the date they should have been reinstated is appropriate for all employees, including those who must be placed on a preferential hiring list because they were replaced before their request for reinstatement.

See C. H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983 (5th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L. Ed.2d 246 (1970); American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970); Laidlaw Corp. v. NLRB, 414 F. 2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). Since sympathy strikers are entitled to the same protection afforded the workers with whom they sympathize, NPC employees who honored the picket line are entitled to the same remedy unless, as NPC contends, these workers were subject to enforceable no-strike obligations.

## IV. ALLEGED NO–STRIKE OBLIGATIONS

■ NPC argues that it was not required to reinstate striking members of the Stereotypers and Pressman Unions and was permitted to discharge them for engaging in a sympathy strike because they were in violation of no-strike clauses in their contracts. See NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). The Board rejected the argument as to each Union. The Board's construction of collective bargaining agreement clauses will stand if it is warranted by the record and has a reasonable basis in law. Employing Lithographers v. NLRB, 301 F.2d 20 (5th Cir. 1962); see NLRB v. C & C Plywood Corp., 385 U.S. 421, 430–431, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

### A. THE STEREOTYPERS

■ NPC contends that the Stereotypers were bound by the preamble of the collective bargaining agreement then in effect not to engage in sympathy strikes. The preamble read:

Witnesseth: This agreement is entered into for the purpose of preventing misunderstanding between the parties; to establish a wage ·scale, working hours and working conditions; to prevent lockouts, boycotts and strikes, and to provide for conciliation if necessary.

The Board held that the preamble merely stated the purposes of the contract and fell "patently short" of a waiver by the Stereotypers of their right to strike. This is a reasonable interpretation and one which we shall not disturb on this record. Relinquishment by collective bargaining agreement of individual Union member's right to observe other Unions' picket lines must be expressed in "clear and unmistakable language." Compare Kellogg Co. v. NLRB, 457 F.2d 519 (6th Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972) (no sympathy strike shall be caused or sanctioned by Union) with Monongahela Power Corp. v. Local 2332, IBEW, 484 F.2d 1209 (4th Cir. 1973) (no employee shall participate in any work stoppage or interference); cf. NLRB v. Item Co., 220 F.2d 956 (5th Cir.), cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955).

### B. THE PRESSMEN

■ NPC asserts that the Pressmen were obligated not to participate in a sympathy strike in 1969 by virtue of either (1) the continuing effect of two arbitration agreements, both of which expired December 31, 1967, or (2) an oral or implied agreement to continue during negotiations the terms of an arbiter's contract that terminated on September 30, 1968.

NPC first argues that the Pressmen were forbidden to strike because the interaction of the arbiter's contract and the International Arbitration Agreement (made applicable by the Individual Arbitration Agreement) created an obligation to arbitrate disputes and a duty not to strike, until such time as the arbiter's contract had been renewed. The Board rejected this argument, holding that there was no contractual relationship between NPC and the Pressmen when members of that Union honored the picket line. This is a reasonable inter-

pretation of the various agreements involved.

The International Agreement provided that the duty to arbitrate would continue after the Agreement's expiration only until then existing local contracts had been renewed. When the Agreement expired on December 31, 1967, the parties' last signed contract had expired September 30, 1965, and the terms of a new agreement were still in arbitration. The contract awarded in that arbitration was not in existence until June 1968. Thus, rather than being a local contract which had to be renewed before the International Agreement's arbitration obligation was extinguished, the award itself terminated that duty. In accordance with the parties' stipulation the contract awarded in arbitration terminated September 30, 1968. Its no-strike provision was limited to the life of the agreement. Accordingly, we uphold the Board's determination that the International Arbitration Agreement's no-strike guarantee was not binding on the Pressmen in August 1970 when they honored the picket line.

NPC's second contention is that the Pressmen had agreed to continue the terms of the arbiter's contract, including the no-strike provision, during negotiations for a new collective bargaining agreement. Although there is some support in the record for this position, other evidence supports the Board's view that there was no express or implied pledge against sympathy strikes. Under the substantial evidence test, therefore, we must uphold the Board. NPC's reliance on Silbaugh v. NLRB, 139 U.S. App.D.C. 82, 429 F.2d 761 (1970), is misplaced. That case merely applied the substantial evidence test to the Board's determination on conflicting evidence that a Union had agreed to extend the terms of an expired contract during negotiations for a new one. It does not provide authority for reversing the Board here.

The petition for review is denied and the order of the Board is enforced.